PERCY L. BRIGHT, Appellant, v. WILLIAM W. WHEELOCK ET. AL., Receivers of Chicago & Alton Railroad Company.—20 S. W. (2d) 684.

Division One, September 13, 1929.

842

*Madden, Freeman & Madden* and *J. V. Jones* for appellant.

844

*Charles M. Miller* for respondents.

846

SEDDON, C.—Plaintiff (appellant), a railroad brakeman, on October 26, 1923, commenced the instant action in the Circuit Court of Jackson County to recover damages for personal injuries sustained at Whitehall, Illinois, on April 14, 1923, while plaintiff was in the employ of the defendants (respondents), who are, and were at the time aforesaid, the receivers of the property of the Chicago & Alton Railroad Company, an Illinois corporation. The action is brought under the provisions of the Federal Employers' Liability Act (45 U. S. C. A., secs. 51-59) and the Federal Safety Appliance Act (45 U. S. C. A., secs. 1-46). The petition, as originally filed, thus states plaintiff's cause of action:

"Plaintiff further states that on or about the 14th day of April, 1923, he was in the service of the defendants, and as such was a member of a train crew which was operating one of defendants' regular trains No. 120 from Alton to Roodhouse, and when said train arrived at the town of Whitehall, plaintiff and the train crew, of which he was a member, undertook to take two cars from a side track and place them in and make them a part of said train, and to do so the front of the engine was coupled to the cars and they

were pulled south, and plaintiff took a position on the step of said engine to cut off said cars and allow them to be carried with their own momentum to their place in said train. When he arrived at a point near the switch that connected said line on which the two cars were placed to the main line, he attempted to disconnect said cars from the engine by means of the pin-lifter, which is a device used to raise the pin and thereby uncouple the cars, but the pin-lifter rod was loose, and slipped to one side, and the coupler failed to work automatically and plaintiff was required to step on the footboard along the pilot of the engine, between the engine and car, and to lift the pin by hand to uncouple the car. At the same time the engineer started the engine back quickly and plaintiff was thrown from his position between said cars to the ground *and stepped in a hole or depression in between the ties,* causing him to fall upon the track and the cars to run upon him, injuring him as follows: [Here follows a specification of plaintiff's injuries.] . . .

"Plaintiff further states that the defendants were negligent in that, at said time and place, the coupler between the engine and the car failed to work automatically, requiring plaintiff to enter on said footboard between the ends of the car and engine to uncouple same by hand; *in that the defendants caused or permitted said hole to be and exist in between the rails at said point;* in that the pin-lifting rod was loose and permitted to slip to one side and thereby caused plaintiff to have to enter between the cars to uncouple them as aforesaid, and that the defendants knew, or in the exercise of ordinary care could have known, *of the hole or depression in the track and* of the defective condition of said pin-lifter rod as aforesaid, and the danger of employees stepping in said hole or using said pin-lifter rod in its loose and defective condition in time, before plaintiff was injured, to have repaired or remedied same, but negligently failed to do so."

The petition was voluntarily amended by plaintiff, during the course of the trial, by striking therefrom the italicized clauses above shown.

The defendants, appearing specially for such purpose only, filed a verified plea to the jurisdiction, the grounds of which plea were these: that the plaintiff and the defendants, and the railroad corporation of whose property defendants are the receivers, are citizens and residents of Illinois; that plaintiff's cause of action arose in Illinois; that all of the witnesses in the cause reside in Illinois; that the defendants are amenable to suit in the courts of Illinois, and to process issuing out of the courts of Illinois; that the maintenance of plaintiff's action in the Circuit Court of Jackson County is an imposition upon the taxpaying citizens of Jackson County and of this

State, and unduly interferes with the efficient operation of a circuit court of this State, and impedes the course of litigation pending in such court between taxpaying citizens and residents of this State; that a trial of plaintiff's action in a circuit court of this State requires the taking of depositions, and the inconvenience and expense of bringing witnesses to this State from Illinois for the trial of the action; and that the cost of maintenance of plaintiff's action in a court of this State is an unnecessary waste and an unreasonable burden upon defendants, as the receivers of a common carrier engaged in commerce between the several states, and is therefore a burden upon interstate commerce, and is a violation of the commerce clause of the Federal Constitution. For the reasons aforesaid, the defendants urged that plaintiff should not be permitted to maintain his suit in a court of this State, and the plea to the jurisdiction prayed the dismissal of the plaintiff's suit. Evidence was heard upon the defendants' plea to the jurisdiction, which plea was overruled and denied by the trial court, and exceptions were duly saved by defendants to such ruling; whereupon the defendants answered the petition.

The answer is (1) a general denial; (2) a plea of contributory negligence; (3) a plea of assumption of risk; and (4) a renewal of the averments, or grounds, set forth in the aforesaid plea to the jurisdiction, with a prayer that plaintiff should not be permitted to maintain his action in the Circuit Court of Jackson County, and that the action be dismissed by said court.

A trial of the action before a jury resulted in the return of a verdict, on May 29, 1925, at the May, 1925, term of said Circuit Court of Jackson County, in favor of plaintiff and against the defendants, wherein plaintiff's damages were assessed by the jury in the sum of $37,500, and judgment was entered on said date in accordance with the verdict. Timely motions for a new trial and in arrest of judgment were filed by defendants, and on May 22, 1926, at the May, 1926, term of said circuit court, the following order was made and entered by said circuit court:

"The court finds that the amount of the verdict is not due to passion and prejudice, but that the verdict is excessive in the sum of $12,500, and that $25,000 would be and is a reasonable amount for plaintiff's injuries, and the court informs the plaintiff that the court will sustain defendants' motion for a new trial on the ground of excessive verdict unless plaintiff remits the sum of $12,500. Whereupon plaintiff remits the sum of $12,500 as of the date of the judgment. Whereupon the motion for new trial is by the court sustained for error in giving Instruction 5 for plaintiff, and error in refusing to give Instruction 12 for defendants, and because of preju-

dicial error in the opening statement of plaintiff's counsel, also improper cross-examination of said witness Utt in reference to said pictures; to all of which actions and rulings of the court plaintiff then and there at the time duly excepted and still excepts. And defendant's motion in arrest of judgment is overruled, and defendants except thereto.''

Plaintiff was allowed an appeal to this court from the aforesaid order granting to defendants a new trial of plaintiff's action.

The evidence herein tends to show that plaintiff was employed as a brakeman upon a local freight train operated by defendants between Alton and Roodhouse, in the State of Illinois. Plaintiff was injured at Whitehall, Illinois, a station located a few miles south of Roodhouse, about 1:15 o'clock on the afternoon of Saturday, April 14, 1923. It is uncontroverted by defendants that the train upon which plaintiff was employed at the time of his injury was composed of a number of cars loaded with merchandise, some of which were being moved in interstate commerce, and therefore it is undisputed upon the record herein that both plaintiff and defendants were engaged in interstate commerce at the time of plaintiff's injury.

The main track of defendants' railroad extends in a north-and-south direction through the town of Whitehall. West of, and paralleling, the main track is a passing track, which is connected at its northerly and southerly ends, by switches, with the main track. Some distance north of the point where the north end of the passing track enters the defendants' main track, another track leads northwesterly from the defendants' main track to a connection with the Chicago, Burlington & Quincy Railroad main line. The latter track is known as the "interchange track," and is described in the record as the "Burlington Y-track." Defendants' freight train arrived at Whitehall about noon of the day of plaintiff's injury. There were some twelve to fifteen cars in the train, and, upon arrival at Whitehall, the train, which was northbound, entered the south end of the passing track, and was pulled onto the passing track so as to clear the main track. The locomotive engine was then detached from the front, or north end, of the train, and the engine again entered the main track at the north end of the passing track, and then proceeded to back southwardly upon the main track for the purpose of doing some switching in the defendants' railroad yard, located at a point south of the south end of the passing track. Upon the completion of the switching movements in the yard at Whitehall, the locomotive engine then proceeded northwardly along the main track, pushing three cars ahead of the engine. The northerly, or foremost, one of the three cars was to be switched to the Y-track, where such

car was to be detached from the other two cars, and left upon the Y-track for a transfer to the Burlington railroad. The other two cars, which had been picked up by the locomotive engine at White-hall, were to become a part of defendants' freight train, which had been left standing upon the passing track, south of the Y-track and west of the main track. The locomotive engine, pushing the three cars ahead of it, as aforestated, entered the Y-track, and the north-erly, or foremost, car was detached from the string of cars and was left standing on the Y-track for transfer to the Burlington railroad. The locomotive engine then backed southwardly upon the Y-track with the other two cars attached to the front, or north end, of the engine. Some 81 feet, or more, distant from, and north of, the south end of the Y-track was a derailing switch (called the "derail" in the record), the purpose of which "derail" was to prevent cars from "breaking loose" when left standing upon the Y-track, and running off the Y-track onto the mainline track by gravity. The plaintiff's injuries were sustained at a point on the Y-track somewhat near the derailing switch, and during the switching movement of the two cars attached to the front, or north end, of the locomotive engine, which two cars were to become a part of the train which had been left standing upon the passing track. The method of such switch-ing movement was for the locomotive engine, backing southwardly on the Y-track, to pull the two cars southwardly towards the main track, whereupon the engine was to be uncoupled from such cars and was to proceed southwardly upon the main track, while the two cars, following the detached engine, and moving southwardly by gravity, upon a slight down-grade, several feet behind the detached engine, were to be switched from the main track onto the north end of the passing track, where their momentum would carry them to the north or front end of the standing freight train, to which the cars were to be coupled, thereby incorporating the two cars into such train. The switching movement aforesaid is referred to in the rec-ord as a "drop switch." After the completion of such switching movement, the locomotive engine was then to proceed northwardly over the main track past the north switch leading to the passing track, and was then to back over the switch onto the north end of the passing track, couple onto the north or front end of the standing freight train, and continue the journey northwardly over the main track to Roodhouse.

In making such "drop" switching movement, it was the duty of plaintiff, as the "swing brakeman" (so-called), to uncouple the lo-comotive engine from the two cars which were attached to the north, or front end, of the engine. According to the testimony of plain-tiff, he took a position upon the east, or right, side of the pilot (com-

monly called the "cow-catcher") of the locomotive engine (which was the engineer's side of the locomotive), with his feet resting upon a small step, about fourteen inches square, attached to the east, or right, side of the pilot. The safety appliance provided for the uncoupling of the locomotive engine from the cars attached to the pilot of the engine is known as a "pin-lifter," or "cut lever." The pin-lifter, or cut lever, is described in the evidence as consisting of a long steel rod, about an inch in diameter, having a right-angle bend at each end of the rod, so as to form a lever or handle on each end of the rod, which rod extends laterally across the pilot of the locomotive, and is held in place by supports or brackets fastened to the top of the pilot beam. At the middle of the pin-lifter rod is fastened a cross-arm, extending outwardly in front of the pilot beam, to the end of which cross-arm is attached a chain, which is fastened to the top of a coupling-pin, which drops into a socket in the knuckle of the coupler. The uncoupling, or pulling of the coupling-pin, of the engine is intended to be accomplished by raising the lever or handle on the end of the pin-lifter rod, which causes the lateral rod to revolve upwardly and backwardly upon its axis, thus raising the cross-arm with the chain attached thereto, and thereby pulling the coupling-pin from its socket in the knuckle of the coupler. Plaintiff testified that the pin-lifter rod of the engine upon which he was working at the time of his injury was supported and held in place by four clevises, or U-shaped brackets, with a cotter-pin, or bolt, running through the top of each clevis, and that the four clevises, or U-shaped brackets, were fastened to the top of the pilot beam. One of plaintiff's witnesses, Elmer Lowder, testified that, on the next day after plaintiff's injury, he examined the pin-lifter on the pilot of the engine on which plaintiff was working at the time of his injury, and that the two end, or outer, clevises were so fastened to the pilot beam of the engine as to permit an "end play," or lateral movement of the pin-lifter rod, of about five inches; that is to say, according to the testimony of the witness Lowder, the two end, or outer, clevis brackets were not fastened to the pilot beam at the extreme outer ends of the lateral pin-lifter rod, next to the lever handles, but were so placed and fastened to the pilot beam as to permit a lateral, or side-wise, movement or shifting of the pin-lifter rod of about five inches.

Plaintiff, who was the only witness on his behalf as to the manner in which his injury occurred, testified that, while standing with both feet upon the right, or east, step of the engine pilot, with his body facing toward the engine, he endeavored to uncouple the engine from the cars by lifting the lever handle on the east end of the pin-lifter rod with his left hand; that he gave the lever handle of

the pin-lifter rod "a couple of jerks and it would not pull" the coupling-pin from the socket of the coupler; that the lateral pin-lifter rod had slipped to the west, or left, side of the pilot beam some three or four inches; that he tried to jerk the pin-lifter rod back into place, but was unsuccessful in such effort; that he then grasped the lateral pin-lifter rod with his left hand and placed his right foot upon an opening in the pilot of the engine underneath the draw-bar of the coupler, his left foot remaining upon the east pilot step, and that he then reached over and pulled the coupling-pin from the socket of the coupler with his right hand, thereby detaching the engine from the cars; and that, immediately after he had pulled the coupling-pin with his right hand and released the engine from the cars, and while he was in the act of again placing his right foot upon the east step of the pilot, the pin-lifter rod slipped, or moved laterally, three or four inches toward the east end of the pilot beam, thereby causing plaintiff to lose his hold with the left hand upon the pin-lifter rod and to fall backward upon the east rail of the Y-track, in front of the oncoming two cars which had just been detached from the engine; that his back struck the east rail of the Y-track, and, seeing the detached cars distant only four or five feet away, and moving southwardly upon the Y-track by their own momentum, he attempted to remove his body from the east rail of the Y-track in front of the oncoming cars, but his body was caught by the journal-box of the forward car, and was rolled some distance along the rail, thereby resulting in the bodily injuries for which plaintiff seeks a recovery.

The defendants' evidence (which consisted of the testimony of the several members of the train crew, and of other employees of defendants who claimed to have witnessed the occurrence) tended to show that, after plaintiff had uncoupled the engine from the two cars, plaintiff then stepped off (or appeared to defendants' witnesses to step off) the pilot of the locomotive to the ground, and started to walk westwardly across the Y-track in the direction of the derailing switch, in front of the detached and oncoming cars. Several of defendants' witnesses testified that it was usual and customary for the "swing brakeman," after uncoupling the engine from the cars in making a "drop switch" from the Y-track at White-hall, to step from the pilot of the engine to the ground between the Y-track and the main track, and await the passing, or movement, of the detached cars to the south, whereupon the brakeman would then cross the Y-track, behind the moving cars, and throw open the derailing switch. The defendants' evidence further tended to show that the pin lifter upon the pilot of the locomotive engine in question had "worked all right," i. e., had properly performed its op-

erative function and purpose, when used by members of the train crew, immediately before and after plaintiff's injury. Plaintiff, himself, did not testify that he had experienced any difficulty in operating the pin-lifter, or that the pin-lifter rod was loose, or that there was any end-play or sidewise movement thereof, prior to using the pin-lifter in making the "drop switch" at the time in question. Defendants' evidence also tended to show that the pin-lifter rod upon the pilot of the engine at the time of plaintiff's injury was supported and held in place by four upright column brackets, or standards, fastened to the top of the pilot beam, the rod running through round holes in the column brackets, instead of being supported and held in place by the clevis, or U-shaped type of brackets, or standards, as claimed by plaintiff; and that the two outer column brackets, or standards, were fastened to the pilot beam of the engine at the extreme outer ends of the pin-lifter rod, adjacent to the lever handles, thereby preventing any "end play," or lateral movement, of the pin-lifter rod.

One of defendants' witnesses, a brakeman and member of the train crew named Brown, testified that, immediately after plaintiff's injury, plaintiff said to Brown that "he (plaintiff) thought he stepped in a hole and overbalanced himself."

It furthermore appears from defendants' evidence that, on May 2, 1923, eighteen days after plaintiff's injury, and while plaintiff was in the hospital at Jacksonville, Illinois, the defendants' claim agent, one Sturdevant, visited the plaintiff at the hospital and procured plaintiff's signature to a type-written statement (which the claim agent, Sturdevant, testified he took upon a typewriter at plaintiff's dictation), purporting to set forth plaintiff's version of the manner and cause of plaintiff's injury. The signed statement of plaintiff was put in evidence by defendants, and reads, in part, as follows:

"On April 14, 1923, I was on duty as brakeman with train No. 120, engine 342. At Whitehall, Illinois, I was injured, the accident occurred as follows: We had a delivery to make to the C. B. & Q. connection and had two cars attached next to the engine in addition to those that we delivered to the 'Q'. The engine was headed north. We had left our train on the passing track, which is west of the main line. We made the delivery on the Y (wye), after which it was our intention to drop the two remaining cars on to our train. I was the swing man, and it was my duty to cut the cars from engine. The track was down-grade towards our train and it only takes a little start to make the cars roll. Brakeman Hensley was on top of the cars at the brakes. Brakeman Brown was at the switch, and I was on pilot of engine on engineer's side. When we got to the point where I wanted to cut the cars off, I gave engineer Utt a

signal and he gave me the slack. I raised the pin-lifter with my right hand—the pin-lifter on pilot of engine. It operated all right and Utt moved back on my signal and I stepped from the pilot. I either hit the end of a tie, or stepped in a depression in the right of way, and I fell. I landed inside the rail; that is, my head, shoulders and body were inside the rail, and my feet and legs outside. The cars I had cut off were within three or four feet of me and moving towards me slowly. I had to move very fast. I threw myself outside the rail and at the same time elevated my feet and legs in a position to clear the wheels. When the trucks passed me some part of them came in contact with my body, which caused my injuries. When I fell across the rail I landed flat on my back on the rail. . . . When I swung out to get off the pilot the pin-lifter slipped, which caused me to lose my balance. I do not know if the pin-lifter was defective, but I do know that it slipped with me at the time I got off the pilot. The pin-lifter slipped out towards me.''

Plaintiff admitted that he had signed the foregoing statement, by affixing at the end thereof, in his own handwriting, the following: ''I have read and signed this true statement. P. L. Bright.'' Plaintiff, however, by his testimony on the trial, repudiated the signed statement, claiming that the statement does not correctly set out the facts as related by him to the claim agent; that the statement was taken at a time when plaintiff was so ill, and was suffering so much pain, as not to be able to read and understand the contents of the statement; that plaintiff did not himself read the statement, but that the statement was read to plaintiff by the claim agent and was signed by plaintiff in reliance upon the representation of the claim agent that it truly and correctly set forth plaintiff's version of the facts; and that plaintiff did not have his eyeglasses at the time he signed the statement, and could not read the statement without the aid of eyeglasses. There was evidence on behalf of plaintiff that he had a high fever at the time the statement was taken by the claim agent, and the hospital chart or record (which was put in evidence by defendants) disclosed that plaintiff had a temperature ranging from 99.4 degrees, at six o'clock on the morning of the day the statement was taken, to 102.6 degrees, at four o'clock on the afternoon of said day. The claim agent testified that the statement was taken about 1:30 o'clock on the afternoon of May 2, 1923.

It also appears from the evidence that, on May 3, 1923, the day following the taking of the aforesaid statement of plaintiff, defendants' claim agent, Sturdevant, went to Roodhouse, Illinois, and took (with an Eastman Primo camera) four kodak pictures, or photographs, of the pilot of locomotive engine 342 (upon which particular engine plaintiff was working at the time of his injury), purporting

to show the pin-lifter fastened to, and in use upon, the pilot of said engine on the date such photographs were taken. The four kodak pictures, or photographs, so taken by defendants' claim agent, Sturdevant, were identified on the trial by the claim agent, and are marked and referred to in the record herein as defendants' Exhibits 21, 22, 23 and 24, and such photographs have been filed in this court, as a part of the record, for our inspection. The controversy at the trial of the instant suit waged largely and chiefly over what type, or kind, of pin-lifter is shown by said photographs, and whether the pin-lifter shown in said photographs is the identical pin-lifter that was fastened upon the pilot of engine 342, and was used by the plaintiff, at the time of his injury. The matters, or incidents, occurring upon the trial and related to the controversy just stated will be set forth and discussed more fully in the course of our opinion. The foregoing, we think, is a sufficient statement of the evidentiary facts and circumstances for the purposes of an opinion herein.

I.   It appears from the record herein that a former trial of plaintiff's action was had in another and different division of the Circuit Court of Jackson County, and before another and different judge of said court, some weeks prior to the second trial of the action, which second and later trial is the one involved in the instant appeal. While the record before us does not clearly show the result of the former trial of the action, it seems to be conceded in the briefs and arguments of respective counsel that the jury on the former trial were unable to arrive at a verdict, thereby necessitating a second trial of the action, which second trial was had at a subsequent term of the court, before the Honorable O. A. Lucas (now deceased), the judge of Division No. 2 of said court. The full trend and scope of the evidence adduced on the first trial of the action (which was had before Hon. E. E. Porterfield, the judge of Division No. 7 of said circuit court) is not disclosed in the record now before us. From the matters somewhat vaguely disclosed in the record on the instant appeal, however, we gather that defendants, at the first trial of the action, introduced in evidence the four kodak pictures, or photographs, of the pilot of engine 342, taken by claim agent Sturdevant on May 3, 1923, and that such photographs were identified at the first trial by defendants' witness, engineer Utt, as correctly representing the pin-lifter that was on the pilot of engine 342 at the time (April 14, 1923) of plaintiff's injury. It appears from the record herein that, during the cross-examination of engineer Utt on the first trial, the witness Utt was asked by plaintiff's counsel (over the objections of defendants) whether the kodak pictures, or photographs, which had been identified by the

witness Utt, show the pin-lifter rod as enclosed in, or as running through, a gas pipe, and the witness Utt answered such inquiry in the affirmative. The witness was then asked, in the course of his cross-examination at the first trial, whether the pin-lifter rod that was on the pilot of engine 342 at the time of plaintiff's injury ran through a gas pipe, and the witness answered such inquiry in the negative. Later in the examination of the witness at the first trial, the witness testified that he was mistaken about what the picture showed, and that the kodak pictures do not show the pin-lifter rod to be enclosed in, or as running through, a gas pipe. So much for the occurrences at the first trial, insofar as we have been able to glean them from the record before us in the instant appeal. We now pass to the incidents occurring upon the second trial, which gave rise to the granting of a new trial by the judge (Hon. O. A. Lucas) presiding at the second trial of plaintiff's action, and which occurrences, or incidents, constitute the basis of two of the grounds specified by the learned trial judge as reasons for the granting of a new trial, namely, "prejudicial error in the opening statement of plaintiff's counsel, (and) also improper cross-examination of said witness Utt in reference to said pictures."

The following occurred during the opening statement made to the jury by plaintiff's counsel, Mr. Madden, at the commencement of the second trial:

"Now, gentlemen of the jury, the evidence will show, and the controversy will range around this point, as to whether or not a certain picture that the company offered in evidence here was the condition of that pin-lifter at the time, or whether or not it was changed. That is a controversy in this case.

"MR. MILLER: I object to that as incompetent, irrelevant and immaterial and an improper statement of counsel to the jury.

"THE COURT: Yes, I think that is more of an argument.

"MR. MADDEN: If Your Honor please, that is the main issue in this case.

"THE COURT: After the evidence is in, that will be a matter of argument.

"MR. MADDEN: No, I think we ought to have a right now to tell this jury what the point of controversy is in this case, and that is the main controversy, as to whether or not a certain picture that the claim agent took after this accident was a picture of this thing or not.

"THE COURT: I understand you object to describing what the picture is.

"MR. MADDEN: All right, I'll leave that out, going to do that when he offers it in evidence. But, gentlemen of the jury, the cir-

cumstances will show that this pin-lifter off of that engine was changed within two weeks after this accident happened.

"Mr. Miller: Just a minute, we object to that as incompetent and an improper statement of counsel to the jury, tending to get before this jury an alleged change of condition after this accident, and I move that the jury be discharged.

"Mr. Madden: That is the controversy, if Your Honor please; the statement of plaintiff what they expect their evidence to show in the case.

"The Court: I don't think that is proper in the opening statement as to what the testimony will show. I think that matter arises when this testimony is before the jury. Objection sustained. The motion to discharge (the jury) overruled. . . .

"Mr. Madden: Now, I think I have a right to say, in connection with that, that following the taking of that statement, under the testimony of Sturdevant, he goes to Roodhouse, Illinois, and he takes a picture of this engine at that time.

"Mr. Miller: Just a minute, if Your Honor please, we object to that as an argument and not a statement of what plaintiff expects to prove in this case.

"The Court: That is an argument; sustained.

"Mr. Madden: If Your Honor please, I don't know what is a statement of facts.

"The Court: That is argument; it is arguing how the testimony was obtained and what was done in regard to it.

"Mr. Madden: We have a right to show that.

"The Court: That is mere argument.

"Mr. Madden: Haven't I a right to tell this jury in the statement what this claim agent claimed when he was on the witness stand and what our claim, our defense to it is?

"The Court: That may not be in the case at all; I don't know; I can't tell; it is arguing on his testimony that has not been given here.

"Mr. Madden: It will be an admission against interest if that testimony was left out, if it was put in at one time, and after they offered the pictures in the case, to leave them out. I think we have a right to show it.

"The Court: That is argument.

"Mr. Madden: Gentlemen of the jury, I will say this to you, that there was an attempt in this case on the last trial of this case to show that this pin-lifter ran through a gas pipe.

"Mr. Miller: Just a minute, we object to that as an argument and not a statement of their case.

"The Court: I think that is argument.

858

"Mr. Miller: And incompetent and immaterial to any issue in this case.

"The Court: Sustained.

"Mr. Madden: If Your Honor please, haven't I a right to discuss anything in this case that was in issue before the last jury?

"The Court: It is an argument, the testimony states facts.

"Mr. Madden: The mention of a fact may be considered a fact.

"The Court: The opening statement is directed to the jury to show what the testimony will show in connection with the case, not commenting on the sufficiency of the evidence or the way it is brought up, or things of that kind.

"Mr. Madden: Well, gentlemen, I will conclude the statement under these conditions with this statement to you, that the pin-lifter that was on that engine, at the time that Bright was thrown and injured, was a single rod running through clevises on the front of the engine, that it was in a loose condition and gave a side play, and, gentlemen of the jury, Mr. Bright has never been able to see that device, after he was able to get around, that was on the engine when he—

"Mr. Miller: We object to that last as an improper statement and tending to prejudice the jury against the defendants in this case, and it is immaterial.

"The Court: I think that is argument, sustained.

"Mr. Madden: Well, then, we will challenge the introduction of your pictures at the trial of this case.

"Mr. Miller: We object to that statement as being an immaterial and incompetent and improper statement, and move that the jury be discharged, and, right in the teeth of the admonition of this court to counsel, they attempt to get improper matter before the jury.

"The Court: I don't think that cuts much figure; sustain the objection.

"The Court: Overrule the motion (to discharge the jury)."

Exceptions were taken by the respective parties to each of the foregoing rulings of the court.

The following occurred at the second trial, in the cross-examination of defendants' witness, engineer Utt, by plaintiff's counsel:

"Q. Mr. Utt, how often or how much had you used this engine 342 on that run before this time when Bright (plaintiff) was hurt? A. I had her altogether a little over two years, but not continuously. Most all of the time, unless it was held for one or two days for work.

"Q. That was the engine you generally used? A. She was assigned to that run.

"Q. Now, were you familiar with the pin-lifter on the front of the engine. A. Yes, sir.

"Q. Did you have the same pin-lifter all of the time you had the engine up to the time Bright was hurt? A. Yes, sir.

"Q. Do you know of any changes having been made in the cut lever before Bright was hurt? A. No, sir.

"Q. Then it was in the same condition, and you had the same type and the same kind of cut lever, those two years while you were using this engine 342? A. The same kind of cut lever; yes, sir.

"Q. Now, did you inspect that cut lever frequently? A. Almost every day I looked around her, and sometimes I noticed that, sometimes I would not. I would always try to see if it was working properly.

"Q. That is—was that a part of your instructions, to test the cut lever? A. My instructions are to look the engine over; it does not say any particular part. . . .

"Q. And so you were almost thoroughly familiar with the kind of a cut lever you had on there up to the time Bright was hurt? A. Yes, sir.

"Q. Now, when did you use this engine again after the day that Bright was hurt? A. I had her right along for quite a while after that.

"Q. When did you go out on your run again after Bright was hurt? A. Went out the next morning.

"Q. The next morning was Sunday morning. A. Well, then, I went out Monday morning, next Monday morning; we don't go out on Sunday. . . .

"Q. Now, you also testified (referring to witness's testimony at the first trial), attempted to identify certain pictures that Mr. Miller (defendants' counsel) produced and offered in evidence, didn't you? A. Yes, sir.

"Q. Do you remember how many pictures that he offered? A. I do not at the present time.

"Q. Mr. Miller asked you on that examination (at the first trial) the following questions (reading): 'Q. Now, I hand you defendants' Exhibit J, and I will ask you if that picture correctly represents the front end of engine 342 as it was at the time of this accident? A. It does; yes, sir. Q. Does that show the cut lever? A. Yes, sir. Q. And the pilot? A. Yes, sir. Q. Was it constructed in that way at the time of the accident as shown in that picture? A. It was. Q. And is that a correct reproduction as it was at the time of this accident? A. Yes, sir. Q. Now, I hand you defendants' Exhibit K, and I will ask you if that is another picture of engine 342? A. Yes, sir. Q. Is that a correct picture

of that engine No. 342 as it was at the time of this accident? A. Yes, sir. Q. And I hand you defendants' Exhibit L, and I will ask you if that is a correct picture of the front end of engine No. 342 as it was at the time of this accident? A. Yes, sir. Q. I hand you defendants' Exhibit M, and I will ask you if that is a correct reproduction of that engine as it was at the time of this accident? A. Yes, sir. Mr. Miller: Now, I offer these pictures in evidence (referring to the first trial).' You made those answers to those questions, did you not? A. Yes, sir.

"Q. You made those answers; now, Mr. Miller had you get down before the jury in showing those pictures, did he not, and you illustrated those pictures, and you pointed out this very pin-lifter now that you claim was on the engine at that time, didn't you? A. Yes, sir.

"Q. And you identified that pin-lifter as shown in that picture as being the one that was in use at that time, didn't you? A. Yes, sir.

"Q. So you swore to that jury (at the first trial) that that was a correct representation of that pin-lifter, didn't you? A. Yes, sir.

"Q. Then did you not admit on cross-examination (at the first trial) that that was absolutely not the correct pin-lifter, not the pin-lifter that was on the engine at the time that Mr. Bright was hurt? Is that true, Mr. Utt? A. Yes, sir.

"Q. You examined those pictures before you were put upon the witness stand, didn't you? A. Yes, sir.

"Q. And after you identified that as being the cut lever that was on there, then you admitted on this cross-examination (at the first trial) that that was false, and that the picture showed that it ran through a gas pipe, and that there was not any gas pipe on the engine at the time that Bright was hurt, didn't you? A. I don't remember what my answers were on that occasion; they are there, I suppose.

"Q. I want to read your answer to my question (reading): 'This rod has been enclosed in a gas pipe across here (indicating)', across the front of the engine, didn't you? A. Yes, sir. Q. You made that admission (reading): 'Q. That is this very rod here (indicating), that is the pin-lifter? A. The pin-lifting rod. Q. That has been enclosed in a sort of gas pipe? A. Yes, sir. Q. Similar to a gas pipe? A. Yes, sir.' Now, Mr. Utt, I asked you this question (reading): 'The picture shows that this rod runs through the pipe, doesn't it? A. Yes, sir.' You made that answer, didn't you? A. I did if it's there.

"Q. And Mr. Miller says (reading): 'I submit that the picture don't show it. Mr. Madden: The witness just answered that it did. The witness: I misunderstood your question. Mr. Madden: I object to the gentleman walking up here and suggesting to the witness

and preventing him from giving a correct answer, and an uninfluenced answer. The Court: Objection sustained. That isn't right.' Your answer then was that (reading): 'The picture is like it was when the accident occurred.' Then I asked you the question (reading): 'You stated a little while ago, before Mr. Miller interfered and walked up to the stand, you stated then, and it is in the record, that this showed the pipe? Mr. Miller: Just a minute. I want to make my objection. I object to the question because the picture shows for itself. The witness did not say anything of the kind. The Court: He asked him if he said so. Mr. Miller: If it is in the record, the record will show. Q. Didn't you state a little while ago, before Mr. Miller made the interruption, that this showed the pipe, and that it ran through a pipe? A. Yes, sir. Q. Isn't that true? A. Yes, sir.' You made those answers, didn't you? A. If they are there I made them. . . .

"Q. You made those answers, at any rate, and that occurred at the first trial of this case? A. The answers I made occurred in the first trial, but I don't remember what my answers were.

"Q. Now, at the time Mr. Bright was hurt the pin-lifter did not run though a gas pipe, did it? A. No, sir.

"Q. You are absolutely positive of that, aren't you? A. Yes, sir.

"Q. Are you absolutely positive what kind of a pin-lifter it was? A. The pin-lifter? Q. Yes. A. Yes, sir.

"Q. I am showing you Exhibit 2 (Exhibit 1 in this trial); it was an exhibit which shows on its face that it was in that (first) trial in Judge Porterfield's court. You remember of my showing you that exhibit, don't you, Mr. Utt? A. Yes, sir. Q. And you examined that exhibit, did you not? A. I did.

"Q. And I asked you these questions with reference to that very matter (reading): 'Q. At the time that Percy Bright was hurt this pin-lifting rod was held in clevises, was it not? Clevises like that, and fastened across with cotter keys (indicating)?' And your answer was (reading): 'A. I don't remember whether it was held by clevises or this other system that is on there now; I could not tell you about that. Q. You don't know about it, then? You are not sure about that? A. No, sir. Q. It may have been held up in clevises like that (indicating)? A. It might have been. Q. By clevis, you mean the top broken, such as used in plows, and then a key running through it? A. Yes, sir. Q. That is what you mean? A. Yes, sir. Q. Now take here Plaintiff's Exhibit 2 (that is Exhibit 1 in this trial), I will ask you to tell the jury if that is not a reasonably fair illustration, or fair drawing, of the way that this rod was fastened across the front of the engine, at the time Mr. Bright was hurt?' And you answered (reading): 'A. It is held to here and here; one on each side and two in the middle (indicating). Q.

It is just the same, with the exception, you say, as to the placing of these clevises? A. Yes, sir. Q. You think that they should be placed closer over to the ends, and these other two ought to be placed closer to the center? A. Yes, sir. You remember giving that testimony, do you not? A. I do.

"Q. Now, then, after I was asking you these questions, you pointed out these clevises that are placed here (on the diagram) in a rough way, one of these clevises being some distance from the end, you thought that they ought to be placed out here (indicating on the diagram), those on the outside ought to be placed out closer to the ends, and those in the middle closer to the right, you pointed that out on this very diagram, did you not? A. Yes.

"Q. And the testimony you gave at that time (the first trial) with reference to your recollection of the kind· of a pin-lifter that was on there was correct, wasn't it; that testimony was correct, wasn't it? A. I told you I couldn't remember whether it was held by clevises or by posts.

"Q. But you made that answer, didn't you, when I asked the question (reading): 'Q. It is just the same, with the exception, you say, as to the placing of these clevises?' You answered: 'Yes, sir.' A. I tell you that question, Mr. Madden—let me explain; I thought you were asking me about how the clevises were placed on any locomotive, not on that particular 342.

"Q. We were talking about 342. A. I told you, before, I didn't know about 342.

"Q. You said you were not sure. A. I said I was not sure.

"Q. You said you were not sure, right back here; that is, you say (reading): 'I don't remember whether it was held by clevises, or this other system that is on there now; I could not tell tbout that. Q. You don't know about it then? You are not sure about that? A. No, sir. Q. It might have been held up in clevises like that (indicating)? A. It might have been. Q. By clevis, you mean the top broken, such as used in plows, and then a key running through it? A. Yes, sir.' You gave that testimony? A. I gave that.

"Q. Then you also answered the questions I have indicated? A. That is why I misunderstood you; I thought those pictures—I thought you were referring to engines which had clevises, not to 342.

"Q. We had this diagram right up there before the jury, and that is the one you had in your hand, and that is the way they were fastened, you referred to this diagram, didn't you, when you referred to the placing of the clevises? A. Yes, sir.

"Q. Now, Mr. Utt, do you tell this jury that after you had used this engine for something like two years, with the exception of some brief time, when it was in the shop and when you had another engine, and that you had examined that pin-lifter from day to day, tested it

every evening when you went in from your work, do you mean to tell this jury that you couldn't tell whether it was fastened by clevises, or whether it was fastened by upright standards; is that your testimony? A. I didn't say I couldn't tell you.

"Q. That is what you testified. A. I didn't know at that time; no, sir. Q. How? A. I didn't remember at that time. Q. You didn't remember at that time? A. Whether they had been changed or not.

"Q. Now, what had bettered your recollection about the condition of that pin-lifter at that time when you were under cross-examination? A. That has been two years; it is a long time to remember.

"Q. But how do you remember it better now than you did in the last trial of this case a month ago? A. Well, I don't quite understand your question.

"Q. What has refreshed your recollection between the time you testified on cross-examination before Judge Porterfield and now? A. In what way? Q. Yes; what has refreshed your recollection as to the kind of a pin-lifter that was on there, and how it was fastened? A. .I can't get you, Mr. Madden, as to what you mean.

"Q. Let me see if I can ferret it out for you; you were taken on cross-examination (at the first trial) just about twenty minutes before court adjourned that night, on Thursday night, you remember that? A. I don't know how long it was before court adjourned.

"Q. In twenty minutes this testimony came out, then court adjourned until the following Monday morning, didn't it? A. Yes, sir.

"Q. And you went back on the stand on the following Monday morning, didn't you? A. Yes, sir.

"Q. And in the meantime you had talked to counsel and your claim agents, hadn't you, with reference to this matter? A. Not very much. Q. Well, you talked some, hadn't you? A. A little; yes.

"Q. You talked some with reference to what you said about those pictures and a pipe running through it, or the pin-lifter running through the gas pipe, had you? A. Yes, sir; I told you I talked some. Q. You talked about that? A. Yes, sir.

"Q. And after you swore positively that the pictures showed that the pin-lifter ran through a gas pipe, and that that was not true, you went back on the stand Monday morning and testified in response to questions from Mr. Miller that you were mistaken, didn't you? A. I did.

"Q. After you went off the witness stand that time, Mr. Utt, and talked with counsel and the claim agents, you saw the pictures again, didn't you, and you examined them very closely? A. I don't remember that I did.

"Q. Didn't you see the pictures again; didn't you have conference about that in (and) your testimony? A. I could not remember now, Mr. Madden, whether I saw them again or not; I remember seeing them one time in Mr. Miller's office.

"Q. Have you seen the pictures since? A. No, sir. Q. You have not been shown them during this trial? A. No, sir. . . .

"Q. Do you know where the pin-lifter that was on engine 342 at the time that Bright was hurt is now? A. Not unless it is on the engine; it is probably on the engine; I don't know.

"Q. Well, you don't know anything about it? A. No, sir.

"Q. You have not got the engine on your run now? A. No, sir.

"Q. When did you make an examination of this pin-lifter with reference to the time Bright was hurt, Mr. Utt? A. I looked it over that afternoon.

"Q. Right away after he was hurt? A. Shortly after, I think; after I came back to Whitehall; after taking him to Roodhouse.

"Q. Why did you make an examination of that pin-lifter? A. I wanted to see if there was any reason why he got hurt, on the pilot or off the pilot. . . .

"Q. When you gave your deposition did you make these answers to these questions (reading): 'Q. What kind of a pin-lifter device is it? A. It has a lift and pins from each side, from each end of the pilot, and connected in the middle with the lever about eight inches long. Right at the end of the lever is a short chain which connects it with the pin-lifter. That is all there is to it. Q. Does it run through a pipe, the pin-lifting device? A. No, sir. Q. It didn't at that time that Mr. Bright was hurt, did it, Mr. Utt? A. I don't think it did, if I remember rightly.' You made those answers, did you not? A. If they are there, I made them; yes, sir.

"Q. Well, I am reading them to you just as they are here. Further down (reading): 'Q. When Bright was hurt it didn't run through a pipe, the pin-lifting device? A. No, sir; it didn't run through a pipe. That is my recollection now. Q. If it runs through a pipe now it has been changed since that time? A. Yes, sir.' That was your testimony at that time? A. Yes, sir.

"Q. On November 16, 1923 (the date of the deposition). Now, in that deposition you were asked something about the play, the side play in the lifter; you went back and you examined the pin-lifter, didn't you? A. I did.

"Q. And when you went back to examine the pin-lifter you did not find much play, side play, in it, did you? A. No, sir.

"Q. And you found at the time you went back and examined (it) that the pin-lifter ran through a gas pipe, didn't you? A. No, sir.

"Q. Now, the gas pipe fits snugly up to the pin-lifter rod, doesn't it, at the ends, and prevents any side play? A. It fits up pretty snug, yes; there is no side play in that place.

"Q. You have seen a pin-lifter that runs through a gas pipe? A. Yes, sir.

"Q. And when you testified in regard to the side play that you found, you were testifying about the pin-lifter that was enclosed in a gas pipe? A. No, sir."

During the course of the foregoing cross-examination of the witness Utt, defendants' counsel interposed frequent and timely objections thereto, upon the grounds that such cross-examination of the witness was improper, and was incompetent, irrelevant and immaterial to any issue in the case, all of which objections were overruled by the trial court. It should be stated herein (maybe) that the witness Utt was not interrogated by defendants' counsel upon direct examination at the second trial, respecting the type or kind of pin-lifter that was attached to the pilot of engine 342 at the time of plaintiff's injury, or respecting the kodak pictures which had been taken of the pilot of engine 342, and of the pin-lifter thereon, by defendants' claim agent on May 3, 1923. On redirect examination at the second trial, the witness Utt was asked by defendants' counsel:

"Q. How long were you on the stand (referring to the first trial)? A. I don't know exactly; quite a while.

"Q. I will ask you if you remember this question being asked you and you giving this answer (reading): 'Do these other pictures show the same thing; that is, that it runs through a pipe? Look at them.' You made the answer (reading): 'A. It is hard to tell whether it runs through a pipe or not.' Did you make that answer? A. I made that answer; yes, sir. . . .

"Q. And I will ask you, again, if along toward the last of your testimony (at the first trial), on Monday, when you came back, these pictures were shown you, and this question was asked you; see if you made this answer, as you recall it (reading): 'Q. Look at those pictures and tell us whether or not you can see, looking at those pictures, whether or not there is a gas pipe over the lifting rod or around the lifting rod? A. I will state, when I looked at these pictures the other day it looked like they were gas pipe; fooled me a little. After I made an inspection of engines that had gas pipe, then I saw I made a mistake in thinking they were covered with gas pipe. These pictures here haven't a gas pipe on it.' Did you make that answer that way? A. I did; yes, sir."

Appellant insists that there is nothing improper or prejudicial in the opening statement of plaintiff's counsel to the jury and in the cross-examination of defendants' witness Utt, and that the grounds specified by the trial court in the order granting a new trial (namely, "prejudicial error in the opening statement of plaintiff's counsel, (and) also improper cross-examination of said witness Utt in reference to said pictures")

are wholly insufficient in law to support, or to justify, the granting of a new trial. Respondents (defendants), on the other hand, insist that the aforesaid grounds specified by the trial court in the order granting a new trial, as the reasons and basis for such order, are sustainable under well-established rules and principles of law. Respondents argue that, beginning with the opening statement of plaintiff's counsel, and continuing throughout the trial, a continuous and repeated effort was made by plaintiff's counsel to get before the minds of the jury the impression that the pin-lifter that was on the pilot of engine 342 at the time of plaintiff's injury had been removed, or changed, shortly after plaintiff's injury, and that another and different type or kind of pin-lifter had been substituted for the pin-lifter that was on the engine at the time of plaintiff's injury; and that such effort was made for the obvious purpose of instilling in the minds of the jury the belief that the pin-lifter was removed or changed because it was defective, so that the jury would draw the inference therefrom that defendants had been negligent in furnishing plaintiff a defective pin-lifter with which to work. Appellant, on the other hand, strenuously denies that such was the purpose of the opening statement of plaintiff's counsel and of the cross-examination of defendants' witness, and insists that the opening statement of counsel and the cross-examination of the defendants' witness Utt were permissible and proper upon the ground, and for the reason, that the witness Utt, by his testimony at the former trial, wherein he identified the kodak pictures of the pilot of engine 342 (taken by defendants' claim agent, Sturdevant, on May 3, 1923) as correctly representing the pilot and pin-lifter of engine 342 as they were at the time of plaintiff's injury, was guilty of a deliberate attempt to fabricate and falsify the evidence upon the first trial of plaintiff's action. It is claimed by appellant that the falsity of the kodak pictures, as purporting to truly and correctly represent the pin-lifter on engine 342 at the time of plaintiff's injury, is revealed by the cross-examination of the witness Utt on the first trial, and by his admissions made under cross-examination at the former trial. Therefore, appellant argues that counsel had the unquestionable right, as a matter of law, to cross-examine the witness Utt respecting the contradictions in his testimony given at the first trial of the action, for the purpose of indirectly impeaching and discrediting the witness. While a large part of the briefs of the appellant is devoted to a discussion and argument of the alleged fabrication of evidence on the part of defendants' claim agent, in the taking of the kodak pictures of the pilot and pin-lifter on engine 342, and the identification of such kodak pictures by defendants' witness Utt as correctly representing the pin-lifter upon the engine at the time of plaintiff's injury, and while appellant insists that the

record herein clearly shows an attempted fabrication of the evidence, yet a close and scrutinous examination of the record herein discloses to our minds no clear or convincing evidence of an attempt, on the part of defendants' witness, to falsify or fabricate the evidence at either of the two trials of the action.

Appellant, in support of the propriety of the cross-examination of the witness Utt, cites decisions of this court, and of the courts of appeals of this State, which announce the rule that great liberality is to be allowed in the cross-examination of a witness, and that it is proper, on cross-examination, to ask a witness any question, whether relevant or wholly irrelevant to the issues, which will test his accuracy, veracity and credibility. [Kleckamp v. Lautenschlaeger, 305 Mo. 528, 538; State v. Davis, 284 Mo. 695, 704; Gurley v. Transit Co. (Mo. App.), 259 S. W. 895, 898; Eidson v. Street Railway Co. (Mo. App.), 209 S. W. 575, 577.] We do not question the correctness of the rulings made in the cited decisions, but an analysis of those decisions discloses that the inquiry made of the witness under cross-examination, in each and every instance, was directed wholly to a matter of fact, and not to a mere matter of conclusion or opinion of the witness.

The cross-examination of the witness Utt at the second trial of the action (which cross-examination is the basis of the ground of error specified in the order granting a new trial, now under review herein) was directed to the former testimony given by said witness at the first trial of the action. The record herein indicates that the cross-examination of the witness at the first trial was with respect to certain kodak pictures, which were identified by the witness as correctly representing the pin-lifter that was on the pilot of engine 342 at the time of plaintiff's injury, and whether such *kodak pictures show* the pin-lifter rod to be enclosed in a gas pipe, or covering. It is quite evident to our minds that the witness Utt was not offered by defendants at the first trial as an expert upon the subject of photography. The inquiry made of the witness upon cross-examination at the first trial as to whether the *kodak pictures show* the pin-lifter rod to be enclosed in a gas pipe was addressed to a non-expert on the subject of photography (indeed, the record discloses that the witness, himself, had not even taken or made the photographs), and, at most, such inquiry, we think, called for the mere expression of an opinion or conclusion by the witness as to what the *kodak pictures show*. The kodak pictures speak for themselves, and non-experts on the subject of photography might well differ in opinion as to what *the pictures show*. The original kodak pictures have been filed as a part of the record in this court, for our inspection, and we must confess our inability to say, with any certitude or assurance, that such

pictures show, or that such pictures do not show, the pin-lifter rod to be enclosed in a gas pipe covering or casing. The same kodak pictures were exhibited to the trial judge on the last trial, and the record before us discloses that the trial judge, in alluding to whether the pictures show a gas pipe covering over the pin-lifter rod, aptly remarked: "I don't see how any body on earth could tell."

While it is the established rule that a witness may be interrogated on cross-examination (for the purpose of indirectly impeaching and discrediting the witness) as to his prior testimony in court, or prior statements made out of court, respecting *matters of fact*, it is an equally well-established rule of law, as announced by the weight of juristic authority, that a non-expert witness (who testifies as to facts) cannot be impeached or discredited by interrogating him, on cross-examination, as to prior contradictory and conflicting *expressions of opinion* given by him, either by way of testimony in court, or by way of statements made out of court.

The latter rule of law is thus clearly stated in 40 Cyc. 2712: "A witness who gives opinion evidence may be discredited by showing that he has expressed an opinion inconsistent with that expressed by him on the stand; *but a witness who testifies as to facts cannot be discredited by a showing of prior expressions of opinion by him,* even though such expressions tend to contradict the inferences which might be drawn from his recital of facts, or are wholly inconsistent with the facts testified to." (Italics ours.)

In Sweeney v. Cable Railway Co., 150 Mo. 385, 400, a witness (who was a passenger on a street car at the time of plaintiff's injury, caused by the collision of the street car with a wagon) testified on the trial of the action that the gripman, in control of the operation of the street car, did nothing towards stopping the street car until just as he struck the wagon. The witness was asked, on cross-examination, if, on a former occasion, he had testified that he "thought the gripman did all he could to stop the street car before it reached the wagon." An objection to the question was sustained by the trial court upon the ground that the question called for an improper opinion or conclusion by the witness. Said this court, in passing upon the propriety of the trial court's ruling: "The purpose of the question was to contradict the witness, and being with respect to a mere conclusion, was not competent for that purpose. The fact that the witness may have testified on a former occasion as to what he thought of the gripman's effort to stop the car was not competent for any purpose in this (trial). 'The rule (that the proof of contradictory statements goes to the credibility of the witness) does not extend so far as to introduce previous expressions of opinion made by the witness.' [McFadin v. Catron, 120 Mo. 252; 1 Thompson on Trials, sec. 493; Com. v. Mooney, 110 Mass. 99; Holmes v. Anderson, 18 Barb. 420.]"

In Hamburger v. Rinkel, 164 Mo. 398, 407, we said: "The contradictory statements which may be shown for the purpose of impeaching a witness must be of facts pertinent to the issue, and which could have been shown in evidence as facts independently of the inconsistency, and not merely of opinion in relation to the matter in issue. [Greenleaf on Evidence, sec. 461; McFadin v. Catron, 120 Mo. l. c. 263, 264.]"

To like effect are our rulings in State v. Nave, 283 Mo. 35, 39, and State v. Aurentz, 263 S. W. 178, 180.

In Holmes v. Anderson, 18 Barb. (N. Y.) 420 (a decision which was approvingly cited by this court in McFadin v. Catron, 120 Mo. l. c. 263), it is held that the rule, which allows a party to impeach a witness by showing that he has made statements out of court that are inconsistent with, and contradictory of, his testimony in court, has no application unless the statements of the witness relate to a matter of fact, and are not merely a former opinion or conclusion of the witness, in relation to the matter in issue, inconsistent with a different opinion which seems to be warranted by his subsequent testimony, or which the facts he testified to tend to establish.

The reason for the rule is clearly and aptly expressed in Southern Railway Co. v. McNeill, 155 Fed. 756, 781, wherein it is said: "Our experience in human affairs teaches us that, in matters of opinion, men are likely to differ materially, and such difference (of opinion) does not tend in the slightest degree to affect the character of one who may have given expression to conflicting opinion at different stages of an investigation of a subject."

In other words, inasmuch as contradictory and conflicting expressions of opinion or conclusion by a non-expert witness, whether by way of testimony in court, or by way of statements made out of court, do not tend to affect the character, credibility, or veracity of such witness, therefore, according to the established rule of law, such non-expert witness cannot be cross-examined respecting prior conflicting and contradictory expressions of opinion by him made, for the purpose of impeaching or discrediting the witness. We are of the opinion that the cross-examination of the witness Utt was in clear contravention of the rule just stated, and that the trial court erred in allowing (over the objections of defendants) the witness to be cross-examined on the second trial of plaintiff's action respecting the contradictory and conflicting expressions of opinion, given by the witness on the first trial of the action, as to whether the *kodak pictures show* the pin-lifter rod upon the pilot of engine 342 to be enclosed in a gas pipe covering. It therefore follows that the trial court committed no error in sustaining defendants' motion for a new trial, and in granting a new trial, upon the specified ground of "improper cross-examination of said witness Utt in reference to said pictures." The

trial court had the right, and it was the duty of the court, to correct its former error in allowing the improper cross-examination of such witness.

The appellant furthermore claims, however, that the witness Utt, by identifying, and vouching for the verity of, the four kodak pictures at the first trial, in effect had testified on that trial that the pin-lifter rod, at the time of plaintiff's injury, was supported and held in place on the pilot beam of engine 342 by column brackets (as is clearly shown in the four kodak pictures), but that, while under cross-examination at the first trial, the witness admitted that the pin-lifter rod, at the time of plaintiff's injury, was supported and held in place by U-shaped clevises, as contended by appellant. Appellant therefore insists that the latter matter amounts to such a self-contradiction of the witness at the first trial as to justify the cross-examination of the witness respecting such self-contradiction upon the second trial, in order to discredit the witness. Reference to the witness's testimony at the first trial (insofar as such testimony is shown in the cross-examination of the witness at the second trial) discloses, however, that the witness did not undertake to say positively whether the pin-lifter rod was supported by clevises, or by upright column brackets. When asked on cross-examination at the first trial concerning the type of brackets used, at the time of plaintiff's injury, to support the pin-lifter rod, the witness answered: "I don't remember whether it was held by clevises or this other system that is on there now; I could not tell about that." The witness was not asked at the first trial to *express an opinion* whether the kodak pictures show the pin-lifter rod to be supported by clevises or by column brackets. He was asked *as to the fact* whether the pin-lifter rod, at the time of plaintiff's injury, was supported or held by clevises or by column brackets, and he answered by saying that he did not remember, and could not tell, which type of bracket was in use upon the engine at that time. While it was proper, upon cross-examination of the witness at the second trial, to inquire of the witness respecting his testimony at the former trial as to the type of brackets used on the pilot of engine 342 at the time of plaintiff's injury, nevertheless it appears that the chief inquiry made of the witness upon cross-examination at the second trial *was not directed to such matter of fact.* The inquiry made of the witness on his cross-examination at the second trial was directed mainly and chiefly to his former testimony respecting whether the *kodak pictures show* the pin-lifter rod *to be enclosed or encased in a gas pipe.* The former testimony of the witness respecting whether the *kodak pictures show* the pin-lifter rod to be enclosed in a gas pipe was merely the expression of an opinion or conclusion of the witness, as we have heretofore ruled, and it was improper, as a matter of law, to cross-

examine the witness on the second trial respecting such expression of opinion or conclusion, or respecting the witness's contradictions thereof, for the purpose of indirectly impeaching and discrediting the witness. The trial court did not ground the order granting a new trial upon the cross-examination of the witness respecting his former testimony as to the *matter of fact* whether the type of bracket used on the pilot of the engine 342 at the time of plaintiff's injury was the clevis, or the column, type of bracket; on the contrary, the trial court specifically grounded the order granting a new trial upon the "improper cross-examination of said witness Utt *in reference to said pictures.*"

But appellant says that the trial court committed error against the appellant in denying him the right to proffer independent and direct evidence of the falsity of the kodak pictures as correctly and truly representing the pin-lifter on the pilot of engine 342 at the time of plaintiff's injury, and that another and different pin-lifter (of the type and kind shown in the kodak pictures) had been placed upon the engine shortly after plaintiff's injury and prior to the taking of the kodak pictures. Without passing upon such matter, but assuming (without ruling) the correctness of appellant's claim of error in the refusal of the proffered evidence, such error, if any there be, does not cure or ameliorate the error of law committed by the trial court in allowing the improper cross-examination of the witness Utt respecting his contradictory expressions of opinion or conclusion as to what the kodak pictures show, hereinbefore discussed and ruled. It is a trite saying that "two wrongs do not make a right."

We think that the ground specified by the trial court in the order granting a new trial (namely, that the court had committed an error of law in allowing the "improper cross-examination of said witness Utt in reference to said pictures"), singly and alone, and unconnected with any other ground, is a sufficient ground in law for the affirmance of such order by this court.

It seems evident, however, that the trial court believed that the remarks made in the opening statement of plaintiff's counsel "as to whether or not a certain picture that the (defendant) company offered in evidence here was the condition of that pin-lifter at the time, or whether or not it was changed," that "the circumstances will show that this pin-lifter off of that engine was changed within two weeks after this accident happened," and "that there was an attempt made in this case on the last trial of this case to show that this pin-lifter ran through a gas pipe," when considered and viewed in connection with the subsequent improper cross-examination of the witness Utt respecting the kodak pictures taken of the pilot and pin-

lifter of the engine 342, constituted prejudicial error against the defendants. Seemingly the trial court was of the belief that a bias and prejudice against the defendants was created in the minds of the jury because of the several incidents of the trial, including the remarks aforesaid made in the opening statement of plaintiff's counsel and the improper cross-examination of the witness Utt respecting the kodak pictures, and that such bias and prejudice was cumulative, and arose out of a combination of incidents occurring throughout the trial, and that such combined incidents resulted in the creation of an atmosphere upon the trial that was not conducive to a fair and impartial trial and submission of the cause to the jury, as the constituted triers of the facts. The trial court is in much better position than is the appellate court to know the prejudicial effect of errors of law committed during the trial, and for that reason the appellate courts seldom interfere with the action of the trial court in granting a new trial, unless it clearly appears that such action of the trial court is in direct conflict with established rules of law, or amounts to judicial indiscretion.

In Stafford v. Ryan (Mo.), 276 S. W. 636, 637, this court said: "We have consistently held that where the lower court considered an error had been committed and granted a new trial, that being in possession of the facts surrounding the hearing and in a position to know the prejudicial effect of the errors complained of, we seldom interfere with the ruling of the trial court."

In Stetzler v. Street Railway Co., 210 Mo. 704, 711, we said: "The trial court is better able than is the appellate court to estimate the value of the evidence and the effect on the jury of the conduct of the parties during the trial. Therefore, it has always been the rule to sustain the action of the trial court in granting a new trial if it appears that the court in doing so acted on grounds peculiarly within the domain of its discretion, and the record so shows. In fact the appellate courts often express regret that the trial courts do not more frequently exercise their power within that domain."

In Reissman v. Wells (St. L. C. A.), 258 S. W. 43, 45, it is said: "Every reasonable inference will be indulged in favor of right action on the part of the trial court in sustaining a motion for a new trial. So, too, the trial court is allowed a wide discretion in ruling upon a motion for a new trial, and appellate courts are reluctant to interfere with the exercise of such discretion. This is particularly true where the motion for a new trial has been sustained . . . for any incident occurring during the trial, the effect of which lies peculiarly within the knowledge of the trial court. Rulings of trial courts in sustaining motions for new trials upon such grounds are rarely interfered with by the appellate courts." [Citing numerous cases in support of the rule announced.]

The natural and psychological effect of the improper cross-examination of the witness Utt, respecting previous contradictory and conflicting expressions of opinion made by such witness, was to discredit and impeach the witness in the minds of the jury, and thereby result in the rejection by the jury of much, if not all, of the testimony of the witness as being unworthy of belief. If the jury believed that the witness had been so discredited, merely because of the contradictory and conflicting expressions of opinion given by him in his former testimony, as developed on the improper cross-examination of the witness at the second trial, then defendants unquestionably were prejudiced (by such improper cross-examination of the witness) in the trial and submission of the case to the jury. The trial court was evidently of such opinion; otherwise, the trial court would not have granted a new trial upon the specified ground of prejudicial error in the improper cross-examination of said witness. The trial court, having presided over the hearing below, was in a peculiarly advantageous position to know the prejudicial effect upon the minds of the jury, arising out of the improper cross-examination of said witness Utt, especially when such improper cross-examination is viewed in connection and combination with other incidents occurring upon the trial. Therefore, we are not disposed to interfere with, or to set aside, the action of the trial court in granting a new trial upon the specified grounds of "prejudicial error in the opening statement of plaintiff's counsel, (and) also improper cross-examination of said witness Utt in reference to said pictures."

II. Since this cause must be remanded for a retrial for the reasons stated in Paragraph I of this opinion, it may be well for us to discuss, somewhat briefly, the two other grounds, or reasons, upon which the trial court predicated the order granting a new trial. One of such grounds was that the court erred in giving, at the request of plaintiff, instruction numbered 5, which reads:

"The court instructs the jury that if you find that the defendants at the time and place in question were engaged in commerce between states as defined in Instruction No. 1, then the plaintiff had the right to bring and prosecute this suit in this county and state, and the fact that the Chicago & Alton Railroad Company is incorporated in Illinois, or that the plaintiff and defendants are residents of that state, or that the injury occurred there, or that plaintiff might have sued in the courts of that state, does not constitute a defense to this cause of action."

It would appear that such instruction was requested by plaintiff in view of the special defense, raised by defendants' answer, that plaintiff's action is not maintainable in the courts of this State be-

874

cause the cause of action arose in the State of Illinois, of which latter state all of the parties are residents and citizens, and the plaintiff could have maintained an action for recovery of damages for his injury in the latter state. The same question was raised by defendants' (so-called) plea to the jurisdiction, filed in the cause and overruled by the trial court, before the defendants answered. Evidence was heard by the court upon defendants' plea to the jurisdiction, which evidence is incorporated in the record herein. The evidence discloses that the defendants own and operate a line of railroad (known as the Chicago & Alton Railroad) in the State of Missouri, and that such railroad extends across the State of Missouri, from the eastern boundary to the western boundary of the State, and that the western terminus of such railroad is Kansas City, Jackson County, Missouri, in which city and county of this State the defendants maintain an agent for the transaction of the usual and customary business of defendants' railroad. It is reasonable to infer from such evidence that defendants carry on intrastate, as well as interstate, business within the State of Missouri. In the case of Shaw v. Chicago & Alton Railroad Co., 314 Mo. 123, 130 (which case involved the identical defense presented by defendants' answer herein), our court has recently held that a showing that a cause of action (under the Federal Employers' Liability Act) arose in the State of Illinois, and that all of the parties to such action are citizens and residents of such foreign state, and that, to try the cause in Missouri requires the bringing of witnesses from a great distance, and at considerable expense to the defendant railroad company, is not sufficient to warrant the dismissal of the action, brought in a circuit court of this State. The legal effect of our ruling in the Shaw case, supra, is that the pleaded facts aforesaid are insufficient to constitute a defense (that is, a bar) to the maintenance of such action in the courts of this State. The ruling of this court in the Shaw case follows, and is grounded upon, our previous rulings in two earlier cases, involving somewhat similar facts and contentions, wherein this court, in effect, ruled such an action to be maintainable in the courts of our State. [Wells v. Davis, 303 Mo. 388; State of Missouri ex rel. Foraker v. Hoffman, 309 Mo. 625.] The opinion and ruling of this court in the Foraker case, last cited, supra, was reviewed, on writ of error, by the United States Supreme Court, which latter court affirmed the ruling and judgment of this court. [Hoffman v. State of Missouri ex rel. Foraker, 274 U. S. 21.] Mr. Justice Brandeis, delivering the opinion of the United States Supreme Court, therein said (274 U. S. 1. c. 22): "Here, the railroad is not a foreign corporation; it is sued in the State of its incorporation. It is sued in a State in which it owns and operates a railroad. It is sued in a county in which it has an agent and a usual place of business. It is sued in a State in which it carries

on doubtless intrastate as well as interstate business. Even a foreign corporation is not immune from the ordinary processes of the courts of a State where its business is entirely interstate in character. [International Harvester Co. v. Kentucky, 234 U. S. 579.] It must submit, if there is jurisdiction, to the requirements of orderly, effective administration of justice, although thereby interstate commerce is incidentally burdened.''

But the respondents urge that the rulings of our court, supra, are in contravention with the rulings of the United States Supreme Court upon such question, as announced in the following cases: Davis v. Farmers' Co-òp. Equity Co., 262 U. S. 312; Atchison, etc., Railway Co. v. Wells, 265 U. S. 101; and Michigan Central Railroad Co. v. Mix, 49 Sup. Ct. 207. The controlling element of fact which distinguishes the cases ruled by the Federal Supreme Court from the case at bar, and from the cases, supra, previously ruled by this court, is that, in each of the cited cases ruled by the Federal Supreme Court, it appears that the defendant railroad corporation did not own and operate a line of railroad in the state in which such railroad corporation was sued, and did not maintain in such state an agent for the transaction of its usual and customary railroad business, but only employed a soliciting agent in such state for the exclusive purpose of transacting the wholly interstate business of such corporation. The evidence in the case at bar shows that defendants own and operate a line of railroad in this State, and maintain in Jackson County, Missouri, an agent for the transaction of the usual and customary business of defendants' railroad. It is reasonable to infer that defendants carry on, within this State, intrastate, as well as interstate, business. Such facts bring the case at bar within the ruling of the Federal Supreme Court announced in the Hoffman case (274 U. S. 21), supra, wherein that court ruled that the action was maintainable in the courts of Missouri, although the cause of action arose in the State of Kansas, where the defendant railroad company was suable and where the plaintiff resided, and although interstate commerce be incidentally burdened by the maintenance of the suit in the courts of Missouri.

Since the argument and submission of the instant cause in this court, respondents have called our attention to the recent opinion (filed on May 13, 1929) of the United States Supreme Court in the case of Douglas v. Railroad Co., 279 U. S. 377, 73 L. Ed. 747, 49 S. Ct. 355, ruled on certiorari to the Court of Appeals of New York. A statute of New York, providing that an action against a foreign corporation may be maintained in a court of New York by a non-resident of that state, where such foreign corporation is doing business within that state, was construed by the Court of Appeals of New York to allow and give to the courts of that state a discretion to refuse

to entertain jurisdiction of a suit (under the Federal Employers' Liability Act) brought in a court of New York, where the injuries sued for were inflicted in a foreign state, of which foreign state the plaintiff was a citizen and resident, and of which foreign state the defendant railroad corporation, was also a citizen, although doing business in New York, where the suit was brought. The Federal Supreme Court affirmed the ruling and judgment of the Court of Appeals of New York, holding that the construction given to the New York statute by the highest court of that state is not in contravention with any provision or requirement of the Federal Constitution, and that there is nothing in the provisions of the Federal Employers' Liability Act which requires the courts of the several states to entertain suits arising under the provisions of that Act of Congress. However, our own court has not construed the (somewhat similar) statutes of this State (Secs. 1163, 1180, R. S. 1919) to invest the courts of this State with the discretion to refuse to entertain jurisdiction of such a suit. Our previous rulings, as announced in the Shaw, Wells and Foraker cases, supra, appear to be to the effect that the statutes, supra, do not invest the courts of our State with such discretion, and we see no good or sufficient reason for overruling, at this time, our prior decisions construing such statutes. It would seem to us that the correction of the evil (herein complained of by respondents), if there be any evil, lies with the Legislature rather than with the judiciary. The giving of plaintiff's Instruction 5 was proper under the law as announced by this court in the cases, supra, and was not error, and hence the trial court erred in predicating the order granting a new trial upon the specified ground of "error in giving Instruction 5 for plaintiff."

III. Another ground upon which the trial court predicated the order granting a new trial is that the court erred in refusing to give instruction numbered 12, requested by defendants. The instruction reads: "The court instructs the jury that if they believe from the evidence plaintiff, Bright, stepped from the step of the pilot of the engine upon the ground, the court further instructs you that it was the duty of brakeman Bright to watch out where he was stepping and be careful in stepping off the step, and the court further instructs you that if they believe from the evidence plaintiff was negligent in stepping off the step onto the ground, and by reason thereof fell and was struck by the cars, then your verdict must be in favor of the defendants."

The requested and refused instruction obviously ignores plaintiff's theory of recovery, which theory is that plaintiff was *involuntarily* caused to fall, or to step, from the pilot of the engine, because of the sudden slipping, or lateral movement, of the pin-lifter rod. If (as

plaintiff's evidence tended to show) plaintiff was *involuntarily* caused to fall, or to step, from the pilot of the engine, because of the sudden slipping of the pin-lifter rod, then we believe that plaintiff was under no duty, as a matter of law, "to watch out where he was stepping and (to) be careful in stepping off the step" of the engine pilot. The requested instruction made no distinction between an *involuntary* and a *voluntary* stepping from the pilot of the engine, but broadly declared that it was the positive duty of plaintiff (no matter what may have been the cause of the stepping) "to watch out where he was stepping, and be careful in stepping." It would amount to an utter absurdity to impose, as a matter of law, such a duty upon a person who is *involuntarily* caused to step from a moving engine, for under such circumstances it is self-evident that it would be well-nigh humanly impossible for such person "to watch out where he is stepping, and be careful in stepping." Manifestly, the requested instruction was too broad in its scope and intendment, and, if the instruction had been given in the form as requested, it would doubtless have confused and misled the jury. Furthermore, the law does not require of one acting under an emergency (as plaintiff's evidence indicates plaintiff was acting at the time) that precision and accuracy of judgment which might be required under different, and more favorable, conditions and circumstances. "It is one thing to judge of a situation in cold abstraction; another thing to form a judgment on the spot." [Chicago, R. I. & P. Ry. Co. v. Brown, 229 U. S. 317, 321.] The refusal of defendants' requested Instruction No. 12 was proper, and the trial court erred in predicating the order granting a new trial upon the refusal of such instruction.

Respondents urge that the order granting a new trial is sustainable upon other grounds, assigned in defendants' motion for new trial, but not specified by the trial court in the order granting a new trial. It is unnecessary to discuss such matters, inasmuch as the order granting a new trial must be affirmed upon the ground, and for the reasons, stated in Paragraph I hereof.

The order of the circuit court granting a new trial is affirmed, and the cause is remanded for retrial. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.