THE STATE v. ADRIAN POSEY and ODIS FOWLER, Appellants.—152 S. W. (2d) 34.

Division Two, June 10, 1941.

*Corbett & Peal* for appellants.

*Roy McKittrick,* Attorney General, and *Aubrey R. Hammett, Jr.,* Assistant Attorney General, for respondent.

ELLISON, J.—The two appellants were jointly prosecuted and convicted of murder in the second degree for beating with a club and killing Mary Vaughn near Bailey's night club and filling station at Holland on U. S. Highway 61 in Pemiscot County on September 11, 1938. The jury assessed the punishment of both at 15 years' imprisonment in the penitentiary. The evidence connecting appellants with the murder was partly circumstantial. Their assignments of error on this appeal complain: (1) that the evidence was insufficient to make a prima facie case for the jury; (2) of the giving of two instructions; (3) of misconduct of the prosecuting attorney in his opening statement, examination of witnesses and closing argument; (4) and of the admission and exclusion of evidence.

It appears that Highway 61 curves but runs in a general northerly and southerly direction along the east side of Bailey's night club. Electric flood lights mounted on high posts illumined the front, north and south sides but the west or back side was shadowed by the building so that visibility was considerably reduced. Behind the night club was a square or rectangular baseball park with a high board fence around it. The northeast corner of this park was about 100 to 175 feet northwest of the night club. There was a men's toilet on the north side or the northwest corner of the night club with an entrance

1092

outside, or it may have been a separate building. The testimony is not clear as to the directions, distances and structures at the scene of the crime. The witnesses refer in their testimony to a map or sketch of the premises, but appellants did not incorporate it in their bill of exceptions.

We will say further that the record is as unsatisfactory as any we have seen in a long time, in the development of the facts, in the stupidity, forgetfulness or perjury of some of the witnesses, and in the general indefiniteness and contradictory nature of the testimony. This may have been because part of the witnesses were drunk when the alleged homicide occurred, and it may be the officers encountered difficulty in obtaining the testimony of numerous persons who were at the night club when the events occurred which led up to the homicide. However, it appears the case had been tried once before the trial from which this appeal was taken, and that there had been a preliminary hearing, which gave the parties an opportunity to familiarize themselves with the testimony and the issues.

The body of the deceased, Mary Vaughn, was found by persons not shown in the record. Coroner Jack Kelly testified he was called about 6:30 in the evening "on or about" September 11, 1938. Constable Kinley viewed the remains when it was "just beginning to get dark" apparently on the same day. Three State Highway Patrolmen investigated the killing "on or about" September 11, 1938. Gay Vaughn, the woman's husband, was found beaten into insensibility in the same vicinity. Yet all the testimony shows the killing occurred after 9:30 P. M. on the night of September 11. The only clue to the time when the two victims were found is furnished by the testimony of Robert Lawler, an attendant at Bailey's filling station. His testimony indicates Gay Vaughn was discovered sometime during the morning of September 12, and that the remains of the women were found that evening. There was no expert testimony as to how long Mary Vaughn had been dead.

At any rate the body of Mary Vaughn was found by the officers on the north side of the ball park behind Bailey's night club, close to the fence and at a distance variously estimated by them as from 40 feet to 175 feet west of the northeast corner of the park, and clear out of view from the night club. Crushed and broken vegetation indicated it had been dragged west from that corner of the ball park to the place where it was found. The woman had been brutally beaten by blows on the head with some blunt instrument. Her forehead was nearly pulverized. She was lying on her back with knees bent and spread apart. Her clothing was torn and pulled up around the waist line, stockings were off or pulled down, and one slipper and stocking were found along the course over which the body had been pulled. Her private parts were exposed and stuffed with a bunch of grass or weeds.

There were footprints of two men going along the course of the crushed down vegetation from the northeast corner of the ball park to the place where the body was found. Thence these tracks continued on west to the northwest corner of the park; then south for a considerable distance; then over the back fence of the park; then cat-a-corner across the ball park back to the front fence—which would lead to the vicinity of the night club. Her husband was lying near the northeast corner of the ball park, and could be seen from the filling station in front of the night club. He was taken to a hospital at Blytheville, Arkansas, and remained unconscious for five days, but recovered and testified at the trial though he couldn't tell a clear story.

Gay Vaughn, the husband, worked for a blacksmith in Steele in Pemiscot County. September 11 was Sunday. He had been drinking. To show his contacts with parties during the day we state the following preliminary facts. He and his wife left Steele about noon. If anyone else was with them he couldn't remember it. They went to the Bailey night club about two miles away. There was a baseball game in the park that afternoon, and Mr. and Mrs. Vaughn were seen at the game by two of the witnesses, though Vaughn, himself, didn't mention it in his testimony. However, he did say he remained at the Bailey resort drinking until about 7 P. M. It was after dark. Then he and Mrs. Vaughn and Doss Miller and someone else drove across the State line to Blytheville, Arkansas. His wife wanted to see her daughter. They didn't get out of the car. On cross-examination he declared no one made the trip to Blytheville with him except his wife and Miller. Miller testified a fourth party, Miss McLean, accompanied them.

They came right back from Blytheville to Bailey's. Then Vaughn and his wife drove with appellant Fowler to Steele and remained there 20 or 30 minutes. He wanted to get some money and did get $2. They returned to Bailey's about 8:30 or 9 P. M. On cross-examination Vaughn was asked if he didn't make this trip to Steele with Doss Miller instead of appellant Fowler, and he answered he was sure it was Fowler. Thereafter Doss Miller testified *he* took Mr. and Mrs. Vaughn to Steele, and that Fowler was not along. Vaughn's purpose was to get some money from his employer. They returned to Bailey's resort about 9:30 P. M. Confronted with this apparently conflicting testimony as to whether it was Doss Miller or appellant Fowler who made the trip to Steele with Mr. and Mrs. Vaughn, the State later recalled Vaughn to the stand and he testified he and Mrs. Vaughn went to Steele *twice* that night, once with Miller and once Fowler. On cross-examination he said he didn't know whether a fourth party was with them when Fowler went along. He further said nobody had talked to him since he had been on the stand before.

There is no doubt about the fact that Vaughn proved to be an exceedingly dull witness. (More later on that.) But it appears to be

conceded by everyone that he and his wife were back at Bailey's resort about 9 P. M., or later. There was dancing and beer drinking and the place was full of people. He and his wife sat at a table but he couldn't remember who were with them. Vaughn said he got pretty drunk. After 30 minutes to an hour he and his wife went out behind the night club within about 20 feet of the ball park fence. He couldn't remember which preceded the other. The appellants were out there and he drank whiskey with them. They were at about the middle of the fence (north and south, as we understand). Vaughn said his wife from a distance of 40 or 50 feet, or 15 steps, "up the fence" (to the north of the middle) called to him and tried to get him to go home. He went to her and while they were talking she said "there they come." As he started to turn around he got a lick on the head and couldn't remember anything more.

But he further stated no one else was out there except the two appellants and his wife. The blow he received on his head made a depression in his skull. He never saw his wife afterward. She was buried before he recovered. Vaughn admitted he had told Bailey he "didn't know anything about it" (the assault and murder) and might have told another man the same thing. He didn't testify at the preliminary hearing and didn't claim to know "anything about it" until the previous trial in the circuit court. He answered he would not say that appellant hit him. He didn't see who did it.

Arch Patterson testified he was at the ball game and the night club. From about 8 P. M. on appellants, Mr. and Mrs. Vaughn and the witness were at a table. A little later in the evening appellant Posey told him he had a date with Mrs. Vaughn. Before that appellant Fowler had said he was going to have intercourse with a woman and didn't give a damn how he got it. Mrs. Vaughn left the table first and appellant Posey followed three or four minutes later, preceding appellant Fowler. That was 9 P. M. or later. Witness Patterson said that after about three minutes he went outside to the men's toilet. Before he entered he saw the Vaughns and appellants standing four or five feet from the northeast corner of the ball park. He heard Mrs. Vaughn say "don't do that." It seemed to the witness she had her arm through Posey's arm. Appellant Fowler and Gay Vaughn were in a pretty good scuffle and it looked like Fowler hit Vaughn with his fist once or twice. Patterson went on into the toilet and when he came out about two minutes later the parties were not in sight.

On cross-examination Patterson said Vaughn continued to drink that night, and while he considered him sober yet Vaughn staggered. He also fixed the hour when the Vaughns and appellants went outside as being 10 o'clock or later, when he had said on direct examination it was 9 o'clock or after. He denied that two girls named Kee were at the table. The witness judged it was about 100 feet from the toilet to the northeast corner of the ball park where he saw the

Vaughns and the appellants talking. He denied. that Mrs. Vaughn was standing 40 or 50 feet north of the midway point of the ball park fence, as Gay Vaughn had testified. He further said he saw. Doss Miller standing in front of the night club by the front door during the evening. (But according to Miller this was at least 30 minutes after the group had left the night club, and appellants and Patterson had returned.) The witness was positive in his identification of the appellants as the parties he saw talking to the Vaughns. by the. ball park, but said "the man who don't make mistakes is dead." However, he declared he didn't. see a club in the hands. of any one of the group of four.

Twenty or thirty minutes later appellants entered the front door of the night club. Witness Patterson went to two other night clubs with them afterwards that night, the Silver Moon. and the State Line Arch. He. quoted appellant Posey as saying before they left. "he probably did something that he would have a home for a long time— I don't know exactly what he. said exactly." He left appellants about 5 or 5:30 in the morning. This witness Patterson admitted he had been arrested for the same murder and held in jail for 34 days. Doss Miller also was arrested on the same charge about 10 days after the witness' incarceration and they were in jail together for about three weeks.

Doss Miller testified that when he returned with the Vaughns from their trip to Blytheville he didn't go into the dance hall, but Mrs. Vaughn asked him to wait for them so he parked his car. about 9:30 P. M. (which was the time fixed by Gay Vaughn and Patterson for the Vaughns' return to the dance hall after they had also made two trips to Steele.) This witness Miller said he remained at the night club sitting around for about an hour and saw Mrs. Vaughn and appellant Posey go out of the night club to the northeast corner of the ball park fence. Gay Vaughn followed them up and a few minutes later appellant Fowler came out of the night club. front door and passed by his (Miller's) parked automobile, going over to. the northeast corner of the ball park where the others were. "They. were standing there drinking or something" and appellant Posey pulled her out in the light and then back in the shadow. Appellant Fowler had his arm around Gay Vaughn. Then all four went behind the corner of the ball park fence. The witness couldn't see them any more. But before they had thus got out of sight the witness saw Arch Patterson come out of the night club and thought he was going toward them but instead he went to the men's toilet and looked toward the group, then entered the toilet, came out again, and again looked. Then Patterson returned by the witness' car and reentered the night club. Patterson testified he didn't see Miller on these trips to and from the toilet.

Miller saw appellants come back from the ball park about 30 minutes

later. They went behind the dance hall and stayed a while and then Fowler came out and went toward the front of the building. After that from his position by the side of the front door the witness saw the appellants and Patterson drinking beer in the night club. On cross-examination the witness said it was after his return with the Vaughns from Steele (not Blytheville) that they reached the night club about 9:30 P. M. Vaughn was staggering when he went to the ball park. This was an hour after the return from Steele. He didn't see any scuffling or licks struck when he observed the parties out by the northeast corner of the ball park. The light was such that he could have seen that if it had happened.

When the appellants came out of the ball park half an hour after they had grouped with the Vaughns at the northeast corner thereof, they emerged at a point further south, more toward the ball park gate and behind the night club. This checks with the testimony of Constable Kinley as to the tracks he observed returning from the body of Mrs. Vaughn west, south, across the west ball park fence and east toward the night club. This witness admitted his arrest and confinement on a charge or investigation of this same murder; and that he had been convicted of a felony and served a penitentiary sentence in 1931. He also refused to deny that while in jail he said to his own wife in the presence of the sheriff's wife, "you know I couldn't have done it because you know I was at home with you."

State trooper Pete Scott uncertainly recalled that appellant Fowler stated on one occasion "he was drinking when it happened," and another time that "he didn't remember." Trooper Percy Little was more definite. He said Fowler told him that he had been at the Silver Moon and Bailey's resort and at the State Line night club drinking during the evening, and didn't know much about what was going on except that he had been to those places—at Bailey's first. He could not figure out how he got to the other two; but remembered waking up in a car out in the country. Trooper Bidwell's testimony was about the same.

For the defense, transcripts of the testimony of two witnesses at a former trial were read. They were sisters named Kee and went together to Bailey's night club on the night of the homicide. One of these girls said she had not had more than two drinks and declared she was not intoxicated, as attested by the fact that she drove her own car and did not have a wreck. The general purport of the testimony of the Kee girls was that they were with the Vaughns and appellants at the night club, and that appellants did not leave while they were there—which was until 10 or 11 P. M.; but that the Vaughns did leave. One of the girls said Vaughn led Mrs. Vaughn out over the latter's protest. It was the opinion of these two witnesses that the appellants were not very drunk, if at all. But they said Vaughn was staggering. Mrs. Vaughn was not. The defense accented and tried to prove

another fact by these two witnesses, growing out of an incident during the evening when one of the girls sat on Gay Vaughn's lap. They said Arch Patterson, who had previously testified for the State, threatened to cut Vaughn's throat before morning. But the court excluded this testimony.

Another witness for the defense, Thurman Norrid, said he was driving a truck loaded with 10 tons of cotton seed to Memphis that night. He started from Holland about midnight, and 300 or 400 feet north of Bailey's night club saw Mr. and Mrs. Vaughn at the side of the road. Both were bare headed. They flagged him for a ride. He didn't stop. This was about two hours after the killing of Mrs. Vaughn, according to the State's theory. A brother of this witness worked at Bailey's filling station. The same witness further narrated that when he had got to the State Line night club, which then or formerly belonged to Harry Bailey it appears, the appellant Posey was there.

Several times on direct examination this witness started to state that Posey said to him, ''are you going to Memphis,'' and ''I want to go down to Memphis to work.'' This testimony was excluded. But on redirect examination the witness did get it in the record that Posey asked ''Are you going to Mississippi?'' and then continued that he was going to Memphis. Witness Norrid then declared that Posey asked him to go back to Hubert Utley's and get his (Posey's) suit case; and he said, and repeated twice, that he turned the truck around with its 10 ton load and did go back and get the suit case. The distance from Holland, where Bailey's night club was located, to the State Line on Highway 61 is 5 miles, of which we take judicial notice.

This witness was recalled for cross-examination and stuck to the same story, at first, explicitly answering in the negative a question whether, instead of driving back to Utley's in the heavily loaded truck, he didn't get a key to appellant Fowler's car and drive back in that to get the suit case. Then counsel for the State read to the witness excerpts from his testimony at the preliminary hearing, where it was narrated in detail that appellant Posey did get a car key from appellant Fowler, and then the witness went back to Holland in Fowler's car and got the suit case. Confronted with that testimony the witness admitted the latter story was true. This was confirmed by appellant Posey when he took the stand later. Posey only rode on the truck as far as Marion, Arkansas.

Another witness for appellants, Tom Shelton, said that about 2:30 A. M. on the morning after the homicide he saw appellant Posey in a restaurant at Joiner, Arkansas. He also saw the last mentioned witness, Thurman Norrid at the same place and on the same occasion. Appellant Fowler took the stand and categorically denied that he killed Mrs. Vaughn and was not ''out there where they say she was

killed.'' He further conceded he was in the night club that night; saw the Kee girls there; and left about 11:00 P. M. On cross-examination he said he didn't know where he was when Mrs. Vaughn was killed. Appellant Posey testified he did not kill Mrs. Vaughn and was not even ''out around the ball park where they say she was killed.'' He saw the two Kee girls at the night club and left about 11:00 P. M., going to the Silver Moon and then to the State Line night clubs. Thence he caught a ride to Marion, Arkansas, after first going back to Hubert Utley's home at Holland, Missouri, with Thurman Norrid in appellant Fowler's car, to get his suit case. Norrid drove the car.

We think the evidence was sufficient to make a prima facie case against both appellants. They say in their brief ''any one or more of a number of persons present'' at the night club that night may have committed the homicide. But several facts point almost directly to them as the brutal slayers of Mrs. Vaughn. Fowler, had been communing with the Vaughns during the afternoon and evening. There is evidence that appellants and Gay Vaughn had been drinking heavily; that appellant Fowler declared he was going to have sexual intercourse with a woman, no matter how he got it; that these three and Mrs. Vaughn went out practically together to the place by the northeast corner of the ball park where the murder evidently was committed; that Fowler was seen in the act of striking Gay Vaughn with Posey close by, arm interlocked with Mrs. Vaughn's; that appellants were seen walking back to the night club 20 or 30 minutes later approximately along the course pursued by the footprints found; that only two sets of footprints were discovered, and no other persons were seen at the place where the killing occurred; that appellant Posey said afterwards ''he probably did something that he would have a home for a long time,'' impliedly referring to the penitentiary; that Posey got his suit case later that night and caught a ride to Arkansas, but did not go on to his alleged job in Mississippi; and that both appellants after taking the stand restricted their testimony within very narrow limits and gave no adequate explanation of their whereabouts and conduct if they were sober and did not commit the crime.

We do not mean to say the burden was on them to disprove their guilt, but with a strong web of testimony enveloping them the inference is warranted that out of the large number of persons present at Bailey's night club that night some testimony beside that of the Kee girls would have been available to exculpate appellants if they were innocent, even though they may have been too drunk to remember. The testimony of witness Norrid is so improbable and contradictory as to import bad faith. In ordinary circumstances the credibility of the State's witnesses Patterson and Miller, also, might be viewed with skepticism, but parts of their stories were corroborated

by the other testimony. It is our view that all these questions were for the jury.

Appellants cite State v. King, 331 Mo. 268, 277(5), 53 S. W. (2d) 252, 256(5), where it is said that when the State has failed to make a prima facie case, but has merely raised a suspicion of guilt in a circumstantial evidence case, the defendant is under no duty to explain it away. That is true. But we think the State did make a prima facie case here. Furthermore, in the King case the defendant availed himself of his constitutional and statutory rights (Art. II, Sec. 23, Const. Mo., Mo. Stat. Ann., p. 354; Sec. 4082, R. S. 1939, Sec. 3693, Mo. Stat. Ann., p. 3247) and did not testify; whereas here the appellants took the stand, and thereby opened the way for comment by State's counsel on their failure to explain incriminating evidence. [State v. Larkin, 250 Mo. 218, 234(3), 157 S. W. 600, 604(4), 46 L. R. A. (N. S.) 13; State v. Pierson, 343 Mo. 841, 859, 123 S. W. (2d) 149, 157(14).] This ruling also disposes of appellants' assignment 4(c) wherein they complain of the prosecuting attorney's reference in his closing argument to their failure to explain away the incriminating evidence against them.

Another assignment of error, 4(a), complains of misconduct of the prosecuting attorney during his opening statement in flourishing a big club before the jury and telling them it had blood stains on it and that it was found at the scene of the homicide. Appellants assert the prosecutor knew at the time he would be unable to identify the club as having been found at that place. Now it is true that the State later failed to introduce the club in evidence. When coroner Jack Kelly, the State's first witness, was testifying a club was exhibited to him, and he said he first saw it at the filling station when he was investigating the murder, and turned it over to the sheriff shortly afterwards. At the conclusion of the testimony of this witness appellants' counsel moved to strike out all his testimony relative to the club and the blood on it. The court said: ''Overruled at this time, unless he can make additional proof, he will connect it up.'' The subject was never thereafter brought up again during the trial.

The assignment now under consideration challenges the prosecutor's good faith in exhibiting the club to the jury during his opening statement. Another assignment (6) charges error in admitting the testimony the coroner did give about the club. On the first of these assignments the law as declared in numerous cases (9 West's Mo. Dig., sec. 703, p. 340) is that the trial court must rely on the good faith of the prosecutor in stating what he expects to prove; and has a large measure of discretion in determining afterward whether he was actuated by proper motives. Appellants never at any time during the trial, so far as we can find, impugned the prosecutor's motives on this item of evidence, and did not renew their objections to it after the State had failed to adduce further testimony on the point. From

the physical facts it was obvious that Mrs. Vaughn had been cruelly beaten to death with some blunt instrument, such as a club. There is nothing in the record indicating the club was of such nature as to arouse the emotions of the jury more than the proven facts about the condition of the body would have done. There is nothing indicating the prosecutor acted in bad faith. He may have been disappointed by the witnesses or have forgotten. We are making no assumptions about that; but feel constrained to abide by the trial court's discretionary ruling on both assignments.

The coroner was also an undertaker. While he was testifying the prosecutor asked him whether in his eleven years experience in that business he had examined corpses where death had been caused by blows and he gave an affirmative answer. Then he was asked how many violent deaths he had investigated during his three year tenure as coroner and he said he didn't know. The prosecutor then asked for his best judgment, whereupon appellant's counsel objected on the ground of immateriality and because the witness had already answered he didn't know. The objection was overruled and then the witness answered that he didn't have any idea as to the number of violent deaths he had investigated. On this appeal appellants urge that the question was prejudicial, and asked by the prosecutor for the purpose of conveying the thought to the jury by *innuendo* that there was too much crime in Pemiscot County. No such objection was made at the trial and hence it cannot be considered here.

On cross-examination of Gay Vaughn, State's witness and husband of the deceased, the fact was developed that he was present at the preliminary hearing before the magistrate but did not testify. Then he was asked if the reason he was not put on the stand was that he had told the prosecuting attorney "he didn't know anything about it at all." The State objected on the ground that "the State couldn't be bound by what it did." The objection was sustained, and appellants assign error on that ruling. The objection is hardly intelligible to us. But the court was obviously right in excluding an answer to the question; since the State would not be bound by the witness' theory or conclusion as to the prosecutor's reasons for not using him as a witness at the preliminary.

Several other questions and answers followed, among which the witness answered one question affirmatively that he had never told any one he "knew anything about it" until the former trial. Then the next question was: "And you don't know anything about it?" The prosecutor renewed a previous objection: "no proper foundation laid and no time fixed." This objection on that ground did not make sense, for the question was not inquiring about some prior conversation the witness had had with some third party at a particular time and place. Nevertheless the court sustained the objection, but

on its own ground, saying: "Sustained, it is for the jury." Appellants complain of that action.

Notwithstanding the objection interposed by the State was not good, still the appellants cannot complain because the court *excluded* the question if that ruling was correct. [Byam v. K. C. Pub. Serv. Co., 328 Mo. 813, 826, 41 S. W. (2d) 945, 952(16).] The principle is the same as where an improper instruction is *refused* although the objection thereto was not good. [See Hogan v. K. C. Pub. Serv. Co., 322 Mo. 1103, 1112, 19 S. W. (2d) 707, 711 (6).]. The question asked the witness was, "And you don't know anything about *it*." (Italics ours.) Did the "it" in this question refer to the actual homicide or to the whole tragic event? The previous testimony of Vaughn had circumstantially pointed to appellants' guilt by locating them, and them only, at the scene of the homicide when he was knocked into insensibility, and presumably about the time Mrs. Vaughn was killed. But Vaughn did not claim to know who hit him, or anything about who murdered his wife. He had a caved in place in his skull from the blow he had received, and was dull and unresponsive. In excluding the question the trial court inferentially ruled it was for the jury to determine from Vaughn's attitude and previous attitude whether he knew anything about "it," meaning the actual murder. If the question meant that, the witness had already admitted several times that he knew nothing about the actual murder. If it meant more than that it called for a conclusion—that is, the witness' opinion as to who did the killing, based on his knowledge of previous events. For these reasons we think there was no error in the court's ruling.

Another similar assignment of error is based on these facts. Witness Patterson was recalled for further cross-examination and asked if he had had a conversation a few days after he was released from jail with Lowell Foster at the J. E. James store west of Holland. The witness answered that he remembered no such conversation. Then the question was expanded and the witness was asked if he had such a conversation in which he said: "they didn't have the guilty parties." An objection was made by the State and sustained by the court that the question had been ruled upon at the former trial. (What the objection was at the former trial, the record does not show.) Then the defense asked to make an offer of proof, the jury was excluded, and appellants offered to ask the question for the purpose of laying a foundation for the contradiction and impeachment of the witness. The court sustained the State's objection that: "it is hearsay and not binding on the State and calling for the conclusion of the witness, the statement involves a conclusion and is not binding on the State, and is made only for the purpose of prejudicing the jury."

Here again the rule stated in the last paragraph applies. Even though the State's objection were not good, if the court ruled cor-

rectly in excluding the question appellants will not be heard to complain. The question inquired if the witness had told a designated third party at a specified place, shortly after he had been released from jail, that "they didn't have the guilty parties." It did not specify to whom the word "they" referred, or what crime the "parties" had been guilty of, or who they were. Neither did the offer of proof show appellants had available the testimony of Lowell Foster to contradict the witness.* Doss Miller and the witness had been held for the killing of Mrs. Vaughn until a short time before the date of the alleged statement by the witness. If he made it, was he referring to himself and Miller, or to appellants, or to whom; and if he was referring to appellants, was it merely his *opinion* that appellants were not guilty? Proof of the latter was not competent even for impeachment. [Bright v. Wheelock, 323 Mo. 840, 868, 20 S. W. (2d) 684, 696.] Appellants' counsel could have clarified all these matters and put the question in a form that would have elicited an answer one way or the other on the only inquiry that was competent. We think there was no error in the court's ruling.

Appellants cite five cases in support of their contention. In three of these the impeaching testimony was *admitted,* and the contention on appeal was that it should have been excluded. In another, State v. Norris (Mo. Div. 2), 2 S. W. (2d) 755, the foundation for impeachment had been laid in the cross-examination of a witness, apparently without objection. In the remaining case, State v. Elkins, 63 Mo. 159, 165, the impeaching testimony was a transcript of the witness' testimony at the preliminary hearing. The admission of it was held erroneous by this court because the witness' attention was not called to it and he was not given an opportunity to explain it. All these are not in point on the proposition before us now—which is that where a question is asked a witness to lay a basis for his impeachment by contradictory evidence from other sources, and the question is *excluded,* the appellant cannot complain except upon a showing that he had asked a proper question, and that he had available the proper evidence to sustain his claim.

The final two assignments of error complain of the giving of instructions 5 and 6-a. Both of these instructions authorized the conviction of the appellants (one instruction of manslaughter, and the other of second degree murder) if the jury found "that the defendants acting jointly or either acting alone" killed Mrs. Vaughn—without requiring a further finding that both acted in the execution of a conspiracy. We are unable to find that this point was raised or even suggested in the motion for new trial, as required by Sec. 4125, R. S. 1939, Sec. 3735, Mo. Stat. Ann., p. 3275. As to instruc-

*On this point see Northwestern Stove Repair Co. v. Cornwall, 148 Mo. App. 605, 612, 128 S. W. 535, 537; Byam v. K. C. Pub. Serv. Co., supra, 328 Mo. l. c. 826, 41 S. W. (2d) l. c. 952 (16).

tion No. 5 the assignment there was that the instruction merely required the jury to ''believe'' the facts given in evidence, and did not require that they *find* them. The assignment in the motion as to Instruction 6-a was ''that it tended to impress the jury that these defendants were guilty of something, if they were not guilty of murder,'' and failed to declare the law properly because it referred to self-defense, when appellants had imposed no such defense and were relying on an alibi. Both of these assignments in the motion for new trial are abandoned in the brief. Appellants' brief also contends both instructions were unsupported by substantial evidence because there was no proof that appellants killed Mrs. Vaughn with a club. That point also was not raised in the motion for new trial, but we have already ruled on it, in effect, in holding there was substantial evidence to support the verdict. It is true the club produced at the trial was not identified but there was abundant evidence that death was produced by an instrument such as a club.

Finding no reversible error in the record the judgment is affirmed. All concur.