**STATE of Missouri, Respondent,**

**v.**

**Elmer WHITE, Appellant.**

**No. 7681.**

Springfield Court of Appeals.

Missouri.

April 18, 1958.

Motion for Rehearing or to Transfer
Overruled May 12, 1958.

Llyn Bradford, Rolla, for appellant.

Jay White, Rolla, for respondent.

**49**

STONE, Presiding Judge.

In this criminal case written on reassignment, defendant was charged by information under Section 559.190 with an assault upon one Robert Duckworth with intent to do great bodily harm, a mixed felony for which the maximum punishment is imprisonment in the penitentiary for five years. (All statutory references herein are to RSMo 1949, V.A.M.S.) Upon trial, the jury found defendant guilty of common assault (on which the court also instructed) and assessed his punishment at imprisonment in the county jail for six months and a fine of $100. Section 559.-220. We have appellate jurisdiction. State v. White, 109 Mo. 223, 19 S.W. 65; State v. Saye, 109 Mo. 224, 19 S.W. 65. See, also, State v. Woodson, 248 Mo. 705, 154 S.W. 705; State v. Murphy, Mo., 256 S.W. 743.

The alleged assault occurred about midnight on Saturday, September 8, 1956, at Glenn's Tavern south of St. James. Among the divertisements offered at this palace of pleasure were beer drinking at the bar, square dancing on the floor, and fighting on the grounds. *Robert's* version of his difficulty was that, as he (Robert) was returning to the tavern from an outside toilet, defendant "started cussin' me and called me everything he could think of, and he said, 'I told you I was gonna get you,' he said, 'I'm still gonna get you,' and he started beatin' on me, and he grabbed me around the neck and bit part of my ear off, kicked me in the groin, and then he wanted to know where my other brother was so he could get him." *Defendant's* version was that, while he was arguing with one Parsons "in reference to another fight * earlier in the evening," Robert "run up and started cussin' and started to hit me," whereupon "me and Parsons just dropped ours" and defendant turned his attention to Robert.

This nocturnal altercation seems to have been motivated by what had occurred during

the forenoon of the same Saturday at the farm home where Robert (then twenty years of age) resided with his parents, the Harlan Duckworths, and their other children. Although not married to Phyllis (Robert's sister then twenty-four years of age), defendant admittedly was the father of two children borne by her. On that Saturday morning, defendant went to the Duckworth home and, accompanied by some disturbance, carried away his three-year old daughter. The *state's* evidence was that defendant then threatened the Duckworths with "I'll get you all at one time; I'll have the difference if I need it." According to *defendant*, the Duckworths "blocked the yard gate" and, when he went "over the top of the high fence with the little girl in my arms because I wouldn't let her stay down there where there's a bunch of them drunk," Robert "called me (defendant) a s— of a b——— and he said, 'I'll get you yet.'"

In view of some of the points to be ruled on this appeal, we think it appropriate to sample the curious, checkered, conglomerate, cacophonic collection of "defenses" tendered to the jury, to-wit:

(a) That the midnight fight at Glenn's Tavern "didn't amount to nothing * * he (Robert) struck at me one lick and missed me, and hit me one lick, and I hit him two licks"—"hit him twicet"—"that was all the fight there was to the whole thing." Defendant's witness Bell, a "distant relation," who had been imbibing his "favorite drink, beer and tomato juice mixed," regarded the fight as "a rather minor affair," so much so that he "wasn't much interested to look," although Bell "was close by at the time and they were both swinging like a couple of windmills." Another defense witness, apparently not so blase and sophisticated and obviously more modest in stating his qualifications as an expert on such matters, "wouldn't say whether it was real serious or not because I never seen a big fight in my life, just kid stuff," but nevertheless doubted whether "they was fightin' real bad because never

anyone was knocked down." But, however defendant and his witnesses may have appraised the midnight fight, a physician found, upon examination the next day, that Robert had a swollen mouth, two lower incisor teeth missing, one upper tooth loosened, a swollen left ear full of blood, a piece bitten out of the top of the right ear, an injury to the right temple and mandibular joint "to the extent he (Robert) wasn't able to open his mouth," a swelling in the left groin "about half the size of a lemon," and "dribbling urine" with blood cells in it.

(b) That Robert had been involved in "another argument or fight or something on the way home" from Glenn's Tavern and was "going to try to frame" defendant by charging him with responsibility for injuries actually received by Robert in a subsequent altercation. The only testimony on this defense was given by Robert's errant sister, Phyllis, who, in response to a recital by defendant's counsel, willingly agreed "that's pretty well the way of it." When asked on cross-examination whether she had been "just about as strong" *against* defendant at the time of the midnight fight as she was *for* him at the time of trial, Phyllis sagely opined "oh, well, I guess whenever you get mad you're liable to say anything or do anything without thinking about it—I'm always in the ability of doing that"—an ability matched in this case only by defendant in his presentation of novel and ingenius defenses.

(c) That, "if I (defendant) knocked any (of Robert's teeth) out, I sure didn't know anything about it," but they were no good anyway. "There was just black roots in the gums down there from chawing tobacco. It was as black as black could be. He never had any teeth." Defendant's counsel interrogated no less than four other witnesses about the allegedly poor condition of Robert's teeth. But, defendant readily conceded on cross-examination that he "had no title" to Robert's teeth, and one of his witnesses likewise agreed that defendant had no "li-

cense" to knock out Robert's teeth, good or bad.

(d) That "the whole (Duckworth) family" was just a bunch of drunks. "I'm a-telling this jury that they just wait from one pay day to the next to get in every tavern and to get drunk and fall. And the old man Duckworth walks up and down the streets messing all over his britches for anybody to see, and I don't think this jury or anybody else will let a little girl stay in it. And I'm telling that, and anybody can see it." In support of this "defense," defendant asserted that, when he went to the Duckworth home during the morning before the midnight fight, he found "they was drinking"; and, the sum total of defendant's surrebuttal was that there was beer in the Duckworth refrigerator that Saturday morning.

(e) That others had fought at Glenn's Tavern on the night of the midnight fight, but that none of them had been arrested. As defendant plaintively put it, "they was a lot more fights that had been knocked down, but there's something funny—there wasn't none of them arrested, I was the only one arrested."

(f) "That wasn't the first time he (Robert) had trouble out there" at Glenn's Tavern.

(g) That Robert, twenty years of age, had "a chauffeur's license" although, as defendant's counsel said, "he has to be twenty-one to get" such a license.

■ Adverting to the issues on appeal, defendant's first complaint is that his application for continuance was overruled. This application, filed when the case was called for trial, was predicated on the absence of three witnesses who, as it was alleged, would have testified in support of defendant's version of the midnight fight. After indicating his belief that diligence had not been shown, the court suggested that perhaps the prosecuting attorney would admit that the missing witnesses would, if present, testify to the facts stated in the application

for continuance. Following a brief colloquy, defendant's counsel said that, if "you will admit they will testify to it, we'll go ahead," and the prosecuting attorney immediately so admitted. Thereafter, defendant's attorney read into evidence what the missing witnesses would have testified, if present. Although merely permitting defendant's counsel to read what an absent witness would say in a criminal case is not always a valid and acceptable substitute for personal appearance of the witness, we note that, in the instant case, the application for continuance was not overruled until defendant had agreed to proceed to trial on the admission of the prosecuting attorney. See State v. Garner, 360 Mo. 50, 226 S.W.2d 604, 608; State v. O'Connor, 65 Mo. 374.

■ In any event, the application for continuance was insufficient. For one thing, there was no substantial compliance with the statutory requirement that such application contain a verified statement to the effect "that the application is not made for vexation or delay merely, but to obtain substantial justice on the trial of the cause." Section 545.720; State v. Bond, 191 Mo. 555, 90 S.W. 830, 833(9); State v. Clark, 147 Mo. 20, 47 S.W. 886, 888(5); State v. Heinze, 45 Mo.App. 403, 407–408(1). More importantly, the application did not show diligence. It recited only that defendant had ordered a subpoena for the missing witnesses "in ample time for said witnesses to be served"; but, it did not state the date on which the subpoena had been ordered or issued, whether or when the subpoena had been served, the place of residence of any of the witnesses, ·or whether (if the witnesses were not found) any information concerning their whereabouts was sought or obtained. An *unsworn* statement that *one* of the three absent witnesses had been sent to "the Veterans Hospital" was attached to the application, but neither that statement nor the application stated the location of the hospital, why the witness had been sent there, or whether or when he might return. An application for continuance should state all pertinent and relevant facts, in order

that the court may be in position to determine whether due diligence has been used, and bare assertions or mere conclusions of due diligence are wholly insufficient. State v. Cooley, Mo., 221 S.W.2d 480, 486(14); State v. Devorss, 221 Mo. 469, 475, 120 S.W. 75, 77. In the final analysis, the granting or refusal of an application for continuance rests largely within the sound judicial discretion of the trial judge. State v. Le Beau, Mo., 306 S.W.2d 482, 486(5); State v. Bockman, Mo., 251 S.W.2d 607, 608(3). There was no abuse of that discretion here.

■ Defendant's next point is that the court erred in permitting the prosecuting attorney in his opening statement to refer to defendant's "relationship" with Phyllis, and in admitting testimony "along that line and concerning their illegitimate children." Necessarily relying to a considerable extent upon the good faith of the prosecuting attorney in making his opening statement, a trial court should be and is vested with a large measure of discretion in determining whether such statement is made in good faith. State v. Posey, 347 Mo. 1088, 152 S.W.2d 34, 40(5, 6); State v. Lindsey, 333 Mo. 139, 62 S.W.2d 420, 422; State v. Matkins, 326 Mo. 1072, 34 S.W.2d 1, 6(9); State v. Beaghler, Mo., 18 S.W.2d 423, 427(5). When objection was made by instant defendant as the prosecuting attorney referred to defendant's "trouble with (Phyllis) over some children that he had with her, although he wasn't married to her" (such reference being in connection with a statement as to what the evidence would show concerning the Saturday morning incident at the Duckworth home), the court carefully made a preliminary and provisional ruling: "Well, I can't tell, it might be a part of the res gestae. It's overruled at this time. We'll see when the evidence comes along." Thereafter, both the state and the defendant evidenced the same eager desire and persistent purpose to develop fully all that had occurred at the Duckworth home on the morning preceding the midnight fight (including

the threats each participant in that fight claimed the other had made at the Duckworth home), and Robert, defendant and Phyllis testified freely and *without objection* concerning the "relationship" of the latter two. In fact, defendant with a trace of paternal pride volunteered, after admitting that he was not married "to the mother of those kids," that "I'm supporting them and always have." On this record, defendant is in no position to predicate error upon the preliminary and provisional ruling on defendant's objection to the opening statement of the prosecuting attorney. Compare State v. Flinn, Mo., 96 S.W.2d 506, 509(5).

■ The "relationship" of defendant and Phyllis and the birth of children to them were admitted facts so inseparably related to and connected with the circumstances which both the state and the defendant undertook to show in explaining and establishing the motive for the midnight fight [cf. State v. Knight, 356 Mo. 1233, 1238, 206 S.W.2d 330, 333] that such facts could not well have been concealed from the jury [cf. State v. Hatcher, 303 Mo. 13, 259 S.W. 467, 469–470; State v. Peters, Mo., 242 S.W. 894, 897]; and certainly, in the absence of timely and proper objection thereto, the admission in evidence of such facts could not have constituted reversible error. State v. Thomas, Mo., 309 S.W.2d 607, 610(6); State v. Gaines, Mo., 261 S.W.2d 119, 124(4, 5).

■ The next assignment of error, i. e., that the trial court exhibited prejudice and hostility toward defendant, is based on a single remark by the court in a colloquy with counsel at the close of the state's rebuttal evidence. When defendant's counsel asked that Phyllis be recalled in surrebuttal, the court pointed out that "the state and the defendant both rested before noon"; but, the renewed request that Phyllis be recalled was granted immediately by the court with the comment, "all right; *let's try to quit somewhere*." (All emphasis herein is ours.) Defendant's counsel made no objection, indicated no displeasure at

the time, and then proceeded to examine Phyllis on only one subject, namely, whether there was beer in the refrigerator when defendant went to the Duckworth home on the morning preceding the midnight fight. Since we do not have a sound recording of what transpired at the trial, defendant's present charge that the italicized remark was "caustically spoken" finds no support. Compare State v. Barnholtz, Mo., 287 S.W.2d 808, 812. Even mild criticism of counsel usually does not require reversal, where the judge's comments in no wise indicate or suggest how he thinks that the case should be decided and in no manner humiliate or reflect upon defendant or his counsel. State v. Stillman, Mo., 310 S.W.2d 886; State v. Thursby, Mo., 245 S.W.2d 859, 863(8, 9); State v. Teeter, 239 Mo. 475, 144 S.W. 445, 447(4). The remark in the instant case, coming near the end of a trial in which the court had displayed remarkable judicial patience and tolerance, did no more than manifest his desire to hear the case expeditiously [State v. Fletcher, Mo., 190 S.W. 317, 323(21)]; and, *even if* the remark were "wholly unnecessary," as defendant here argues, it affords no basis for a finding that thereby defendant was prejudiced or his right to a fair trial was infringed. State v. Schubkegel, Mo., 261 S.W.2d 933, 935 (5); State v. Montgomery, Mo., 223 S.W. 2d 463, 466(19).

Defendant further complains of error assigned thus in his motion for new trial: "The court erred in admitting incompetent, irrelevant and immaterial evidence offered by the state, *over the objection of defendant,* more specifically as to other fights defendant was alleged to have had on other occasions, defendant not having first put his good reputation in issue * * *." It is doubtful whether this assignment preserved any issue for appellate review [State v. Perriman, 352 Mo. 1022, 180 S.W.2d 668, 669(3); State v. McKeever, 339 Mo. 1066, 101 S.W.2d 22, 28(10)]; but, treating the complaint (as have counsel) as directed at the testimony of *defendant's*

witness Gann [State v. Cavener, 356 Mo. 602, 202 S.W.2d 869, 873(1, 2)], we are satisfied that it is without substance or merit. After preliminary questions establishing that Gann was a police officer at St. James and that he knew both Robert and defendant, counsel for *defendant* hopefully posed this leading question on *direct* examination, "well, now, since September the 8th or 9th, 1956, *the defendant, Elmer White,* hasn't been in any trouble down there, has he?" and, *without objection,* elicited this answer, "Not that I know of. I mean, not any—(hesitates)—no trouble that I have any knowledge of." Then followed a brief but unsuccessful effort to elicit information as to *Robert's* general reputation.

On cross-examination, the prosecuting attorney immediately asked, "Now, you say that you've—don't know of any trouble Elmer White (defendant) been into *in several years* there?" and, *without objection,* witness Gann said, "Well, not to my personal knowledge." Shortly, in response to the inquiry, "Well, you knew he run a tavern for several years?" came the answer, *again without objection or motion to strike,* "I have heard that he did, Mr. White." The next question, "And haven't you heard about a lot of fights and things he had around that tavern?" provoked *the first objection* by defendant's counsel, i. e., that "the defendant hasn't put his good reputation in issue and so the state's not permitted to attack it." After a brief colloquy the court ruled, "Well, *sustained,* I guess, in that form. *He* (defendant's counsel) *did ask him* (defendant) *if he'd been in any trouble since September the 9th.* Anyway, try to bring out what you think the jury should know about the issues in the case in order to help them decide the case fairly and properly." To the next question, "Now, don't you know that Elmer's had many fights out there where he's took unfair advantage of the other persons all the time, striking him unfairly and maliciously and violently attempting to injure them personally and disable them—," de-

fendant's counsel interposed *the only other objection* found in the testimony of this witness, "Now, that's objected to," and the court promptly ruled, *"Sustained; unless you limit it to some particular time."* The cross-examination then was concluded with the question, "Well, don't you know when he beat Verlon Ridenhour, who had a plate in his head, beat him unmercifully with a club; don't you know about that?" and the answer again coming *without objection or motion to strike,* "I have heard of these occasions; I don't personally know of them. I haven't lived in St. James that long."

█ The short but sufficient answer to the assignment that the court erred in admitting, *"over the objection of defendant,"* incompetent evidence as to other fights is that, as the transcript plainly shows, no such evidence was received *over objection.* On the contrary, the only two objections by defendant were *sustained.* Having obtained from the court all that he requested, and having permitted the trial to proceed to a conclusion without further objection, motion or protest, defendant has no basis for further complaint here. State v. Benjamin, Mo., 309 S.W.2d 602, 606(7); State v. Baber, Mo., 297 S.W.2d 439, 443(11); State v. Baker, Mo., 277 S.W.2d 627, 631(11); State v. Eaves, 362 Mo. 670, 243 S.W.2d 129, 132(6); State v. Fenley, 309 Mo. 520, 275 S.W..36, 40(10, 11); State v. Butler, Mo.App., 309 S.W.2d 155, 159(5). Consult also State v. McBrayer, Mo., 269 S.W.2d 756, 760(4); State v. Breeden, Mo., 180 S.W.2d 684, 687(13); State v. Woolsey, Mo., 33 S.W.2d 955, 957.

█ It is true that, where a prosecuting attorney deliberately transgresses the bounds of propriety and repeatedly refers to manifestly improper and prejudicial matter, so much poison may be injected that it may not be neutralized even though the court sustains defendant's objections thereto. E. g., State v. Allen, 363 Mo. 467, 251 S.W.2d 659; State v. Lasson, 292 Mo. 155, 238 S.W. 101, 103–104(5); State v. Burns,

286 Mo. 665, 228 S.W. 766; State v. Webb, 254 Mo. 414, 162 S.W. 622, 628(7); State v. Shipley, 174 Mo. 512, 74 S.W. 612. See, also, State v. Tiedt, 357 Mo. 115, 206 S.W. 2d 524; State v. Dixon, Mo., 253 S.W. 746, 748; State v. Connor, Mo., 252 S.W. 713, 720–722. But, in our view of the case at bar, there is no basis for application of that doctrine. In the first place, no such point has been preserved for appellate review, for defendant's motion for new trial included no assignment of error to that effect. The motion for new trial must state in detail and with particularity the specific grounds or causes therefor [Supreme Court Rule 27.20, 42 V.A.M.S.; Section 547.030; State v. Tellis, Mo., 310 S.W.2d 862], and we may not waive that essential requirement for preservation of alleged error. State v. Hendrix, Mo., 310 S.W.2d 852.

█ But, *even if* a complaint of the character discussed in the last preceding paragraph had been preserved in defendant's motion for new trial (which it was not) and had been presented on appeal (where defendant does not even undertake to raise or argue any such point in his brief), it would not have been well-taken on the record before us. After defendant voluntarily opened the subject of whether he had "been in any trouble" since September 8, 1956 [improper as that inquiry was because evidence of general reputation should be limited to the time of the offense charged—State v. Bugg, 316 Mo. 581, 292 S.W. 49, 50(3); State v. Wertz, 191 Mo. 569, 90 S.W. 838, 841(3, 4)], certainly he could not complain of cross-examination on the same or related matters. State v. Duncan, Mo., 254 S.W.2d 628; State v. Carroll, Mo., 188 S.W.2d 22, 24(5). Consult also State v. Willis, Mo., 283 S.W.2d 534, 538(7, 8); State v. Palmer, 161 Mo. 152, 61 S.W. 651, 657–658(8). And, when defendant ·did not object to the first question on cross-examination, "Now, you say that you've—don't know of any trouble Elmer White been into *in several years* there?" and accepted the favorable answer "well, not to my personal knowledge," it

would seem that he could not predicate error upon subsequent cross-examination concerning the same period. Compare State v. Willard, Mo., 192 S.W. 437, 440(4).

█ When a defendant puts his good reputation in issue, it becomes proper for the state to cross-examine in good faith concerning rumors of specific acts of misconduct (not remote or ancient), even though such inquiries may impute particular offenses to defendant. State v. Havens, Mo., 177 S.W.2d 625, 629(12, 13); State v. Privett, 344 Mo. 1020, 130 S.W.2d 575, 580(4); State v. Cooper, Mo., 271 S.W. 471, 473–474(2–4); State v. Carson, Mo. App., 239 S.W.2d 532, 535–536(3, 6). Since "such cross-examination should refer to 'rumors' and 'reports' of fact of misconduct—derogatory in character—rather than to the witness' personal knowledge of particular facts" [State v. Carroll, supra, 188 S.W.2d loc. cit. 24], some of the questions on cross-examination of witness Gann obviously were improper in form. But, there was no such objection; and, as we have pointed out, the only two objections by defendant were sustained. The rulings on those objections suggest that the trial judge had in mind the period after September 9, 1956 (undoubtedly opened to cross-examination by defendant himself), and probably would have sustained a proper and timely objection to the last question put to witness Gann, i. e., whether he knew about defendant having beaten one Ridenhour with a club. Making no objection, defendant apparently preferred to gamble on the witness' answer but lost when it indicated that the Ridenhour assault was not an apocryphal incident—not a figment of fertile fancy. We are unwilling to say that, by thus holding his silence, an attorney may entice opposing counsel and the trial court into irremediable error. Compare State v. Morris, Mo., 248 S.W.2d 847, 852 (7–9); State v. Mosier, Mo., 102 S.W.2d 620, 628(19). Furthermore, in similar rhetorical overtones, the prosecuting attorney theretofore had asked defendant on cross-examination, "how many times you been convicted for taking unfair advantage in a fight and injuring someone maliciously and violently?" and, *without objection,* had received the answer, "one time; I got a dollar fine." And, *again without objection,* defendant had been asked on cross-examination "well, you did pay a $25 fine * * * for committing an assault on this Greig boy out there, striking him from behind with a club or something?" and had admitted paying such fine, although stoutly maintaining that he had done this only to protect a son (of undisclosed age) who was the real culprit.

█ During most of the trial, opposing counsel figuratively contended in the legal arena in much the same style as the gladiators in the midnight fight had done, that is, with bare knuckles and with no holds barred. The transcript adequately demonstrates that defendant's counsel was not a self-effacing or reluctant combatant on that plane. Compare State v. Richetti, 342 Mo. 1015, 119 S.W.2d 330, 343–344(18). After defendant willingly had rolled and wallowed in "catch-as-catch-can" fashion in all of the muck and mire dredged up, his coat of many defenses was, by the late round in which witness Gann appeared, so mud-splattered and stained that it is to us inconceivable that it could have been soiled further by the final lump of mud tossed in his direction during Gann's cross-examination. The trial judge was vested with a large measure of judicial discretion in determining whether improper questions or statements by counsel were so prejudicial as to require either a reprimand or a mistrial. State v. Smith, 355 Mo. 59, 194 S.W. 2d 905, 907–908; State v. Willard, 346 Mo. 773, 142 S.W.2d 1046, 1054(22). Consult also State v. Green, Mo., 292 S.W.2d 283, 288(10); State v. Hardy, 365 Mo. 107, 276 S.W.2d 90, 95(9); State v. Whipkey, 361 Mo. 1008, 238 S.W.2d 374, 379(25); State v. Tiedt, 360 Mo. 594, 229 S.W.2d 582, 588 (11). And, having carefully reviewed the entire record, we are not persuaded that the cross-examination of witness Gann, from whatever viewpoint it may be con-

sidered, was so patently improper and inflammatory as to necessitate our granting a new trial, sua sponte. Compare State v. Slaten, Mo., 252 S.W.2d 330, 334; State v. Rhoden, Mo., 243 S.W.2d 75, 78; State v. Tyler, Mo., 306 S.W.2d 452, 458–459; State v. Carroll, supra.

The judgment of conviction should be and is affirmed.

McDOWELL, J., concurs.

RUARK, J., dissents.

RUARK, Judge (dissenting).

I wrote an opinion in this case, but the other members of the court did not agree and I am reduced to dissent as to the last point ruled by the principal opinion.

I believe that the questions, answers, and rulings which occurred in the cross-examination of the witness Gann, when taken in combination and in cumulative effect, constituted prejudice which entitled defendant to a new trial. His motion for new trial challenged error in admission, over objection of defendant, of evidence as to fights which defendant had on other occasions, "defendant not having first put his good reputation in issue and this being an attack upon it by specific acts." Separate assignment of error number 5 in his brief presented this, and in his points and authorities 4 and 5 he attempted to cite authority to sustain this contention. When defendant testified as a witness in his own behalf he was cross-examined as to previous convictions. This was proper, because such affected his credibility as a witness, and was without objection, except that near the conclusion of that cross-examination the prosecuting attorney asked defendant if he had been in any fights "since this occurrence," and this defendant denied (objection after answer was sustained). In only one instance and at one place in the record did the state attack defendant's past reputation for law violation, this by ref-

erence (in real effect what amounted to statements so couched as to indicate personal knowledge on the part of the prosecuting attorney) to specific incidents of unfair, malicious, violent, and brutal misconduct by the defendant on occasions which were previous to the date of the crime here charged.

In this one and only instance the defendant called George Gann, a police officer of the city of St. James, who testified that he had not been there long and had been acquainted with the people of that community for possibly a year and a half. By this witness defendant attempted to prove reputation of the prosecuting witness, Duckworth, for law obedience, but the witness failed to qualify and the state's objection was sustained. In that same direct examination defendant's attorney asked the witness:

"Q. Well, now, *since September the 8th or 9th, 1956*, [the case was being tried on June 26, 1957] the defendant, Elmer White, hasn't been in any trouble down there, has he? A. Not that I know of. I mean, not any— (hesitates) no trouble that I have any knowledge of."

The full flavor and effect of the cross-examination and the rulings of the court can be shown only by statement verbatim:

"Q. (By Mr. White) Now you say that you've—don't know of any trouble Elmer White [has] been into *in several years* there? A. Well, not to my personal knowledge.

"Q. You mean you just haven't seen it? A. I haven't seen him—it.

"Q. Well, you know he run a tavern *for several years*? A. I have heard that he did, Mr. White.

"Q. And haven't you heard about a lot of fights and things he had around that tavern?

"Mr. Bradford: Now wait a minute. If the Court please, the defendant

hasn't put his good reputation in issue and so the State's not permitted to attack it.

"Mr. White: Well, he has by asking that question.

"Mr. Bradford: No, I didn't ask about his reputation.

"Mr. White: You in effect put it in. Well, you're asking about the same thing.

"The Court: Well, sustained, I guess in that form. He did ask him if he'd been in any trouble *since September the 9th*. Anyway, try to bring out what you think the jury should know about the issues in the case in order to help them decide the case fairly and properly.

"Q. (By Mr. White) Now *don't you know* that Elmer's had many fights ·out there where he's took *unfair advantage* of the other persons all the time, striking him *unfairly and maliciously* and violently attempting to injure them personally and *disable* them—

"Mr. Bradford: Now, that's objected to.

"Mr. White:—don't you know that?

"The Court: Sustained, unless you limit it to some particular time.

"Q. (By Mr. White) Well, don't you know when he beat Verlon Ridenhour, who had a plate in his head, *beat him unmercifully with a club*; don't you know about that? A. I have heard of these occasions. I don't personally know of them. I haven't lived in St. James that long.

"Mr. White: Well, that is all."*

(a) Assuming that the inquiry as to whether defendant had been in any trouble *since* the assault date tendered an issue as to *that* period (see State v. Carson,

Mo.App., 239 S.W.2d 532), I am of the opinion it did not open the issue as to defendant's conduct during the years of his life preceding that date. A defendant has the presumption of good character until he clearly and expressly puts it in issue. 22 C.J.S. Criminal Law § 676, p. 1069; City of St. Louis v. Tanner, Mo.App., 143 S.W.2d 354; State v. Pinkston, 336 Mo. 614, 79 S.W.2d 1046.

(b) But if we *assume* that the unfortunate question concerning defendant's conduct after the assault date opened a veritable Pandora's box of specific incidents · which occurred during his past life and prior to September 8, then it would seem to me that proof of such incidents would be obtainable only by evidence obtained from an inquiry in the nature of a direct examination and not by cross-examination of the character here presented. The witness had not testified concerning the period of time or the lurid incidents which were dug out of the past, coated with the prosecuting attorney's very personal, opinionated, and colorful description, and flung at the witness.

(c) Be that as it may, I am of the opinion that the whole context of the cross-examination was improper and prejudicial for another reason. Ordinarily proof of independent crimes is not admissible. State v. Leonard, Mo., 182 S.W.2d 548; State v. Cole, Mo., 213 S.W. 110; State v. Ingram, Mo., 286 S.W.2d 733. Cross-examination of character witnesses concerning rumors or neighborhood talk which the witness may have heard is permissible, but only for the limited purpose of testing the reliability of the witness, *and not for the purpose, or to accomplish the effect, of proving the fact that other offenses have been committed*. State v. Mahan, Mo., 267 S.W. 866; State v. Cooper, Mo., 271 S.W. 471; State v. Mitchell, 339 Mo. 228 96 S.W.2d 341; see discussion Reuben v. U. S., 7 Cir., 86 F.2d 464, 468; see extensive annotation, 47 A.L.R.2d 1261, 1274, et seq.

---

* Italics are my emphasis.

In State v. Carroll, Mo., 188 S.W.2d 22, the Supreme Court endeavored to secure some fairness toward defendants by laying down some restrictions covering cross-examination of character witnesses. Among them are: That the inquiry must not be as to matters remote; it must be directed to rumors and not be of the "don't you know" variety; above all, the questions must not be couched in such manner that they amount to an implied or indirect assertion of the existence of such facts. They should not be thinly veiled assertions that the prosecuting attorney knows such facts to be true. 58 Am.Jur., Witnesses, secs. 660 and 661, p. 364; State v. Seay, 282 Mo. 672, 222 S.W. 427; Pittman v. U. S., 8 Cir., 42 F.2d 793, 796; Little v. U. S., 8 Cir., 93 F.2d 401, 408; see Underhill's Criminal Evidence, 4th Ed., sec. 172, p. 302. Neither should the questions and cross-examination go into detail any more than is necessary to identify the rumors or misconduct to which the attention of the witness is directed. It must be remembered that the defendant is helpless to defend his real, if any, innocence against a flank attack of this sort, and the inquiry should not contain a hair-raising, skull-splitting recounting of unsavory facts in order to slip before the jury a recital of malevolent or gruesome details (which may or may not be true and if true may have been justified) which are bound to influence the jury. 58 Am.Jur., Witnesses, sec. 659, p. 364; Annotation, 71 A.L.R., § II d1, p. 1519; State v. Beckner, 194 Mo. 281, 91 S.W. 892; State v. Crow, 107 Mo. 341, 17 S.W. 745(3); State v. Parker, 172 Mo. 191, 72 S.W. 650; Magee v. State, 198 Miss. 642, 22 So.2d 245.

In this instance I think the sum total of the prosecuting attorney's inquiries polluted the atmosphere of fairness which should surround a criminal trial by discharging therein the fact that defendant ran a tavern for several years (in a period not covered by the examination in chief); had *had a lot of fights "and things"* there; that he, impliedly to the knowledge of the prosecuting attorney ("don't you know"), *"took unfair advantage"* "all the time"; that he *maliciously* attempted to injure and *disable* persons; and finally, that he took a club and *"unmercifully beat" a man "who had a plate in his head."* If the jury members had not made up their minds to a verdict of maximum punishment by then, no doubt this series of statements accomplished that result.

Prosecuting attorneys are more than advocates. They are officers both of the state and of the courts. It is *not* their duty to secure willy-nilly and at all costs a conviction. They should be impartially fair and they should abide by the established rules of evidence and procedure. State v. Tiedt, 357 Mo. 115, 206 S.W.2d 524; State v. Bowenkamp, Mo., 39 S.W.2d 753; State v. Wellman, 253 Mo. 302, 161 S.W. 795, 800; State v. Nicholson, Mo.App., 7 S.W. 2d 375. Nor is the trial of a criminal case a gladiatorial contest in which the weaker or the inept must inevitably succumb before the more experienced, the more persistent, or the more fierce and violent fighter. It sometimes becomes the duty of the court to intervene, even though there is no objection. State v. Lasson, 292 Mo. 155, 238 S.W. 101, 104; State v. Rhoden, Mo., 243 S.W.2d 75, 78; State v. Connor, Mo., 252 S.W. 713, 722; see State v. Shipley, 174 Mo. 512, 74 S.W. 612; State v. Dixon, Mo., 253 S.W. 746, 748. The trial court has a discretion to exercise in regard to cross-examination of character witnesses. State v. Wilson, Mo., 248 S.W.2d 857; State v. Wilson, Mo., 34 S. W.2d 98. And in this case I think it should have been exercised to restrain the inquiry.

(d) My brethren hold that defendant did not object enough and that he got all he asked for, and so it can well be argued by taking the questions and objections singly and one at a time; but in my opinion this sweeps under the rug the broader question of cumulative prejudice. Defendant objected twice and received only qualified rulings. Either such rulings were not sufficient to inform the prosecuting attorney

and to restrain him from proceeding with that line of inquiry on the one hand, or if so, then on the other hand the prosecuting attorney proceeded in defiance of such rulings. The defendant objected, but the objections netted no result. In baseball parlance, the prosecuting attorney got on base with his vehement and colorful accusations of misconduct, whether through a hit or a base on balls. Defendant did not object to the last question, but of what avail another and further objection here? So far as the *practical* effect upon the fortunes of the defendant was concerned, his two previous objections had been overruled. No further ruling of the court on the last question could have removed the prejudice which had already been engendered. The damage had already been done. "The astute lawyer for the state had sunk his fangs deep in the life blood of the defendant—too deep for the poison to be withdrawn." State v. Webb, 254 Mo. 414, 162 S.W. 622, loc. cit. 628. It is not necessary for a defendant to further prejudice himself before a jury by making repeated objections to the same character of testimony when it is obvious that such objections will be useless. State v. Sanford, 317 Mo. 865, 297 S.W. 73, 77; State v. Goldfeder, Mo., 242 S.W. 403, 404. And even though the objections are sustained, if the mere asking of the questions has injected ineradicable poison and prejudice, the defendant is entitled to a new trial. State v. Burns, 286 Mo. 665, 228 S.W. 766, 769; State v. Teeter, 239 Mo. 475, 144 S.W. 445; State v. Nicholson, Mo.App., 7 S.W.2d 375; see State v. Archie, 301 Mo. 392, 256 S.W. 803; State v. Dixon, Mo., 253 S.W. 746. I think that these questions and objections cannot be considered and ruled upon singly but must be looked at in combination. One cannot fairly take the individual questions and objections separately and assess the full force of their effect, any more than one can pull the petals one by one from a rose and from examining these individual petals say, "This flower has no beauty or fragrance." It is the sum total and combination of the cross-examination which worked injury to the defendant and in my opinion denied him a fair trial. The evidence in this case strongly indicates the defendant was guilty of a vicious and brutal assault; but we should not let our abhorrence of his acts lead us into approval of that which was prejudicial to his rights and which, approved or even condoned, may in the future be used to convict innocent men. For such reason I believe the case should be remanded for retrial.